## Arcadia Theatre Company (et al., Appellant) *v.* Sablosky.

36

Argued May 6, 1964. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Michael H. Egnal,* with him *Eugene F. Brazil,* and *Egnal and Simons,* for appellants.

*Morton Witkin, I. Raymond Kremer,* and *David S. Malis,* with them *Malis, Malis & Malis,* for appellees.

OPINION BY MR. JUSTICE O'BRIEN, December 3, 1964:
This appeal is part of a complex of litigation among the parties for control of the Arcadia Theatre Com-

pany, a Delaware Corporation. The sole asset of the corporation is an operating theatre in Philadelphia. The entire outstanding issue of stock of the corporation is sixty shares, of which forty shares are owned by Samuel and Edna Shapiro, husband and wife, as joint tenants with right of survivorship, and twenty shares are in the name of Morton J. Sablosky.

Marital difficulties arose between Samuel and Edna Shapiro and they separated in January, 1962. Their sons, Merton and Bennard Shapiro instituted an action in equity for specific performance under an agreement which gave each son an option to purchase ten shares of stock owned by their parents.[1] The parties and Morton J. Sablosky, not a party in the action for specific performance although the owner of one-third—20 shares—of the stock of Arcadia entered into a stipulation and consent decree in April, 1962. The substance of the consent decree was that there would be no change in corporate structure or in the personnel of the officers or directors pending final hearing. Another consent decree was filed on December 21, 1962, which, inter alia, referred to a meeting on November 26, 1962, in which a de facto board of directors was elected. Morton J. Sablosky was released from any restriction imposed upon him in the use of his stock as agreed to in the consent decree of April, 1962. The December, 1962, consent decree sought to establish some order in the operation of the theatre pending the chancellor's adjudication. The adjudication was filed in August, 1963. On September 4, 1963, Edna Shapiro and Morton J. Sablosky issued a call for a special meeting of Arcadia stockholders to be held on September 12, 1963.

A few days later, the within action was commenced —a complaint in equity filed and preliminary injunction granted—and hearing date set. Counsel for the

---

[1] *Shapiro v. Shapiro*, 415 Pa. 503, 204 A. 2d 266 (1964).

parties, by stipulation approved by the court, agreed to the appointment of the Master and "2. That the powers and duties of said Master shall be as follows: (a) To supervise the collection and distribution of all receipts until the next election of Directors of Arcadia Theatre Company with the object in view to see they are proper. (b) . . . (c) To consider and pass upon the question when it shall be proper for Arcadia Theatre Company to hold its next meeting of shareholders for the purpose of electing a Board of Directors. (d) To act as chairman and judge, and to rule upon all dis-' putes, at the next election of Directors of Arcadia Theatre Company. 3. That immediately after the next election of Directors of Arcadia Theatre Company the powers and duties of the said Master shall cease and determine."

The Master commenced the performance of his duties, in pursuance of the stipulation filed, immediately after his appointment on September 24, 1963. He filed his written report on November 27, 1963.

Plaintiffs filed a motion to dismiss and suppress the master's report for the reason that "it now appears that counsel entered into the Stipulation . . . [providing for the Master] unwittingly, and without an awareness of [the Pennsylvania] Rule of Civil Procedure 1514." Exceptions were also filed to the report of the master assigning, among other reasons, that the master exceeded his authority in many respects and ignored certain provisions of the bylaws of Arcadia.

The court approved the master's report and adopted the findings of fact and conclusions of law and entered the following order: "1. Plaintiffs' motion to suppress or dismiss the Master's report is denied. 2. Plaintiffs' exceptions to the Master's report are dismissed. 3. The stockholders meeting of November 26, 1962, is declared invalid. 4. The directors' meetings of November 26, 1962, December 17, 1962, August 29, 1963, and Octo-

ber 4, 1963, are invalid. 5. The special stockholders meeting held on November 5, 1963, was a valid special stockholders meeting and the board of directors, consisting of Morton J. Sablosky, Bennard Shapiro, Nathan Markovitz and Edna Shapiro was duly elected at that meeting and may, henceforth, act as the board of directors of the Arcadia Theatre Company until the next valid election of directors."

Appellants assign as error: I. The master was without any authority to make any factual or legal determinations. II. Authority for the master could not be supplied by consent or otherwise. III. The master violated the injunction of September 9, 1963, which was continued in full force and effect under the stipulation of September 24, 1963. IV. Acts of de facto officers and directors are binding on all persons who acquiesce in their management and direction. V. The validity of the election of November 26, 1962, was beyond the scope of the issue and not determinable in an equity proceeding. VI. In fixing the date for the special meeting of shareholders, the master ignored sections of the bylaws.

The really dominant issue here is the extent of the master's participation. Rule 1514 of the Rules of Civil Procedure provides: "Except as otherwise provided by Act of Assembly or rule of the Supreme Court, no examiner, master or auditor shall be appointed."

The office of master in chancery was abolished in 1894. Abuses had developed from its use to the detriment of litigants in numerous respects. The responsibility of the court and its functions were being delegated to masters in chancery. In *Commonwealth ex rel. v. Archbald,* 195 Pa. 317, 318, 319, 46 A. 5 (1900), the Court, in speaking of the adoption of the rule abolishing the office of master in chancery in 1894, spoke of the evils which had arisen in the use of the master: "This application is founded on that portion of the

amended *equity rules* adopted in 1894 (see 159 Pa. 25 [XXV]), which provides that 'the office of master in chancery is hereby discontinued, except in proceedings where decrees or interlocutory orders are to be executed, or their execution supervised by an officer of the court.'

"The object of the revision of the equity rules was to lessen the delay and expense of the proceedings, and in furtherance of the principle which is the proudest feature in the history of Pennsylvania jurisprudence that equity is part of the common law of the state, to assimilate as closely as may be, the practical administration of justice in the two forms of procedure. . . . By insensible degrees the office of master outgrew its position as a mere executive or administrative arm of the court, and usurped or had imposed upon it, functions which were strictly judicial. This state was not alone in its experience in this regard. 'It is not competent for a court of chancery on its own motion or upon the request of one party to abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers:' Beach on Modern Equity Practice, sec. 673, citing Kimberly v. Arms, 129 U. S. 512.

"It was to obviate this tendency among other reasons, that the present rules were adopted by this court. But the office of master though 'discontinued' with reference to its general use in the then existing practice was not abolished. It is a necessary part of the equipment of a court of chancery, extending back at least to the time of Edward the Third: Bennet, The Master's Office in the Court of Chancery, p. 1. By our rule, it is still continued 'in proceedings where decrees or interlocutory orders are to be executed.' . . ."

A master may not be appointed to take testimony, make findings of fact and suggest a decree. He cannot make a judicial determination. In *Rowley v. Row-*

*ley,* 294 Pa. 535, 539, 540, 144 A. 537 (1928), the function of a master or one acting under certain duties imposed by the court or by agreement of parties and the approval of the court, was discussed: "Prior to the adoption of the Equity Rules of 1894, masters were commonly appointed to take testimony, make findings of fact and law, and report decrees for consideration by the chancellor. At that time the office of 'master' was discontinued, 'except in proceedings where decrees or interlocutory orders are to be executed, or their execution supervised by an officer of the court.' Thereafter an equity proceeding could not be heard generally by a master, but it was necessary that the testimony be submitted to the court to make the findings of fact and law, as well as the appropriate decree nisi, to be followed by a final one after hearing by a court in banc. A proceeding otherwise conducted was a nullity, and without validity: Palethorp v. Palethorp, 184 Pa. 585. But after decree properly made, such as the direction to account, it was permissible, under the rules, to appoint a master to carry out the order made: Com. v. Archbald, 195 Pa. 317; Gibson Distilling Co. v. Netter, 62 Pa. Superior Ct. 136; Murphy v. Murphy, 85 Pa. Superior Ct. 169. It was the common practice, under these rules, to appoint a master to state an account, when the right to it had been preliminarily determined: Rolshouse v. Wally, 272 Pa. 506.

"On January 1, 1925, the new equity rules went into effect, and the exception, found in those of 1894, as to the appointment of masters, was altered, as appears by Rule 15, which declared that 'no examiners, masters or auditors should be appointed save in these instances where, by statute, or these rules, it is expressly so provided.' This regulation was made so that the testimony, upon which the decree was based, should in all cases be heard by an equity court, and to remedy the abuse of shifting this burden from the

chancellor to some chosen member of the bar, followed, as it would be, by oppressive costs. But express provision was made by Rule 65, where the final decree for an accounting had been entered, to name experts or assessors to pass on debits and credits, and strike the balance due, . . . . 'Whether the person to whom the case is sent be called an assessor, an auditor, a referee or a master, is of no importance, the substance of the matter is the right of the court in exceptional cases to avail itself of exceptional assistance, in executing or supervising the execution of the details of its work, not requiring the exercise of exclusively judicial functions. It has not been shown that the court below exceeded its discretionary powers in this respect': Com. v. Archbald, supra, p. 320.

"There is express authority given to the court by Rule 65 to appoint an assessor to state an account, where, in its discretion, the character of the accounts involved makes this course expedient. It cannot appoint a master to take testimony, make findings of fact and law, and suggest a decree, and determine whether an account is legally required, but, when these matters have been judicially determined, the statement of the proper items of debit and credit by an assessor is permissible, as was done here by stipulation of those interested. . . ."

And in *Darlington v. Reilly,* 375 Pa. 578, 101 A. 2d 900 (1954), it was said at page 580: "Our former equity rules are applicable. Equity Rule 15 provided in presently material part that '. . . examiners, masters or auditors [shall not be] appointed [in equity], save in those instances where by statute or these rules it is expressly so provided.' In application, Rule 15 has been construed to mean that a court of equity lacks power to appoint a master or auditor to hear and pass upon facts or questions of law essential to an adjudication which it is for the chancellor to make: see

Houghton v. Restland Memorial Park, Inc., 343 Pa. 625, 629-630, 23 A. 2d 497; cf., Rowley v. Rowley, 294 Pa. 535, 539-540, 144 A. 537. In the Rowley case Mr. Justice SADLER, speaking for this court with respect to Equity Rule 15, said,—'This regulation was made so that the testimony, upon which the decree was based, should in all cases be heard by an equity court, and to remedy the abuse of shifting this burden from the chancellor to some chosen member of the bar, followed, as it would be, by oppressive costs.' And, in Palethorp v. Palethorp, 184 Pa. 585, 586-587, 39 A. 489, it was held that a decree in equity based upon a report by a master appointed by the court, while Equity Rule 15 was in force, had nothing to support it and was, therefore, a nullity.

"However, it was Equity Rule 65 (now Equity Civil Procedural Rule 1515, 369 Pa. xxxvii) upon which the learned court below relied in appointing an auditor or assessor, skilled in accounting, to audit the trustee-receiver's account and to examine, inter alia, into the claims of creditors and report to the court for its consideration and decision. Equity Rule 65 permitted the appointment of a referee or assessor in cases involving complicated accounts. Here, the matter involved long drawn out and exceedingly complicated accounts. Rule 65 afforded an efficient procedure in the circumstances. The fact that the order appointing the auditor exceeded the contemplation of Rule 65 and transgressed the inhibition in Rule 15 upon the appointment of masters or auditors did not vitiate the proceeding. The situation is quite analogous to that in Buse & Caldwell Dissolution Case, 328 Pa. 211, 216, 195 A. 9, where 'The delegation of power to state an account was consistent with Rule 65; but the powers given in the order of appointment were too broad to the extent that they exceeded the scope of Rule 65 and included powers forbidden by Rule 15.' We avoided the seeming difficulty

in that instance by not applying 'the rule that the finding of fact supported by evidence and approved by the court in banc will be accepted here.' Mr. Justice LINN, who spoke for this court, said (p. 216),—'That error will, however, not require a retrial below. We think a larger view of the situation may be taken in this court without creating a general precedent. As the validity of the claims of the two parties to the dispute turns on the finding of several ultimate facts, we have gone over the evidence de novo and, for reasons to be stated, have reached, without any difficulty, a conclusion in which we all concur. This has been done because we think, in the circumstances presented, the public and the parties should not be put to the unnecessary expense of a retrial of the case where that can be avoided without harm or injustice to either party.' The foregoing language is presently apposite. Here, the learned chancellor did not adopt the auditor's report on the appellants' claims as conclusive but went directly to the record and on the basis of his own independent findings based on undisputed documentary proofs proceeded to an appropriate disposition of the appellants' claims. . . ."

A situation somewhat like the instant matter confronted the court in *Deal v. Erie Coal & Coke Co.*, 248 Pa. 48, 54, 55, 93 A. 829 (1915) : "It is contended that under Equity Rule 60, discontinuing the office of master in chancery, the court was without power to appoint a master to conduct a corporate election, or that at least it could not do so, until it had first determined all questions which might be raised as to the right of stockholders to vote at such election. But the rule in question contains the following clause: 'Except in proceedings where decrees or interlocutory orders are to be executed, or their execution supervised by an officer of the court.' We regard the facts of the present case as bringing it directly within the exception. The

court below by its decree directed that an election should be held at a certain time and place and in a certain manner, and appointed a master to execute this order and supervise the holding of the election, with the special purpose of preventing disorder or violence. It would be manifestly impossible for a court to foresee, and pass upon beforehand, all the questions which might arise with respect to the rights of all the electors, when they should claim the right to vote. But by prescribing the time and place for holding the election, and by appointing a master to supervise it, and to see that it was lawfully held, the trial court itself provided an opportunity for all stockholders to exercise their lawful rights. Only votes which were offered, and to which objection was made, could become the subject of consideration. It could not be known beforehand whether any objection to any of the votes offered, would be made. The power of a court of chancery to control and supervise the election of directors was invoked in this case, in advance of the election, to prevent fraud or force, and to make sure that the right of each stockholder to vote if questioned, should be passed upon by an impartial and disinterested person, whose decision was subject to immediate review and correction by the court. The master was in this case merely the executive or administrative arm of the court. The abuse which was corrected in abolishing the office of master in chancery, in so far as its general use is concerned, was well known and recognized. A tendency had grown up whereby in many cases the duty of determining the controversy presented, was shifted from the judges of the Court of Chancery, to masters appointed by them . . . . [And also citing Commonwealth ex rel. v. Archbald, 195 Pa. 317]."

The opinion in the *Deal* case dealt with the distinction in *Yetter v. Delaware Valley Railroad Company,* 206 Pa. 485, where it was said at page 55: "But there

46

the controversy related to a fundamental issue presented by the pleadings, as to an alleged over-issue of 5,-000 shares of stock. The question raised might easily have been adjudicated by the court in advance of the election, and it should have been." In *Yetter* the master was appointed to conduct the election of the stockholders and to pass upon the legality of the issue of stock. This was clearly an unauthorized judicial act. There the court said at page 487: "It is true, counsel for the railroad company appeared and consented to the appointment of the master; but our rules of practice are not to be disregarded even by consent, and, even if they could, in the present case the attorney for the company had no authority to speak for the stockholders, who were the only parties directly affected by the court's order. . . ."

The record in this case reveals a bitter controversy for control of the Arcadia Theatre and numerous legal actions being litigated in the courts with the inevitable consequential injury to the operation of the theatre and its economic status. Some of the litigation involved mismanagement and the alleged misuse of corporate funds.

Samuel Shapiro and his wife, Edna Shapiro, the joint owners of 40 shares of stock, were having marital troubles and could not agree in voting their stock. Both had served notice against the voting of the stock by the other, which consequently prevented either one from voting. The remaining 20 shares of stock were owned by Morton J. Sablosky, who was not in agreement with Samuel Shapiro. The Samuel Shapiro interests seized control of the corporation in November, 1962. He voted the 40 shares of stock even though Edna Shapiro, his wife, objected to his doing so. Morton J. Sablosky was unable to vote his 20 shares because of a consent decree entered in one of the other legal actions, by which he agreed not to vote his shares during the pe-

riod the decree was in effect. Later Mr. Sablosky was free to act, which he did by calling a stockholders' meeting.

When Morton Sablosky and Edna Shapiro issued a call for a special meeting of the shareholders of Arcadia, the plaintiffs countered with the present equity suit, securing a preliminary injunction. At the time set for the hearing, instead of going on with the trial, the parties entered into an agreement, with the approval of court, which stipulation was filed and is now the basis of this controversy.

The parties themselves denominated the "master" in the agreement by providing "that Lambert B. Ott, Esquire, be appointed by the court to act and function as master in this case." Of course, master in chancery had been abolished in 1894, and any functions of a judicial nature as performed by a master in chancery were abolished. The name master, however, has persisted with sometimes well-defined duties, and at other times with no particular definition. In this case, however, the parties, by stipulation, outlined the duties of Mr. Ott, who was named master. His function by that agreement was to perform certain duties under the jurisdiction of the chancellor, and not as a substitute for the chancellor. It is necessary in some equitable actions for the court to avail itself of persons who can see to the performance of certain duties, either defined and outlined by the court, or by agreement of the parties and approved by the court, just so long as those duties are not judicial. The record indicates that Mr. Ott supervised the collection and distribution of receipts of the theatre, and otherwise supervised the personnel operating the theatre. He held numerous meetings and conferences and decided upon the time to hold the meeting of shareholders for the purpose of electing the Board of Directors, and acted as chairman and judge of that election when new directors were

elected. In the performance of his duties, it was necessary for him to acquaint himself with the numerous corporate and legal maneuverings of the parties, which required him to examine the minutes of meetings and all of the incidental legal papers emanating from the activities of the parties engaged in this litigation. The record indicates the chancellor had before him all of the evidence and documents involved in this litigation that were material to the determination of the controversy. There was, practically speaking, no testimony from which disputed facts were to be decided, the questions being legal ones. The record also indicates that while the master filed his report, the chancellor made his own determination, which agreed with the report of Mr. Ott.

Appellants complain that the master was without any authority to make any factual or legal determinations. However, the determinations, factual and legal, were made in a judicial proceeding by the chancellor, and not by the master. In this instance, the person called the master was actually performing a function as an arm of the Court, under the direction and supervision of the Court. It is true, as argued by appellants, that the authority of a master could not be supplied by consent or otherwise. We said in *Yetter*, page 487: "Our rules of practice are not to be disregarded even by consent." If the agreement for the master and his functions and duties violated Rule 1514, the stipulation would have been of no effect. However, the agreement entered into did not violate the rule, nor did the master go beyond the function agreed to in the stipulation.

Appellants contend the master violated the injunction of September 9, 1963, which continued in full force and effect under the stipulation of September 23, 1963, and approved by the court the next day. Appellants lose sight of the fact that the action was not that of

the master, but of the chancellor, who was in control of the proceedings.

The chancellor declared the stockholders' meeting of November 26, 1963, invalid, for the reason that Samuel Shapiro, over the objection of his wife, Edna Shapiro, voted the 40 shares of stock of the Arcadia Theatre Company, which were jointly held by them. He also held invalid meetings of the board of directors and officers elected at that meeting of November, 1962. He also held invalid certain changes in the bylaws attempted to be enacted by the board of directors elected at the meeting of November 26, 1962. The chancellor declared the meeting of November 5, 1963, to be a proper meeting of the shareholders, at which meeting Morton J. Sablosky legally voted his 20 shares of stock. This meeting was conducted by the master in conformity with the agreement.

Appellants contend the validity of the election of November 26, 1962, was beyond the scope of the issue and could not be determined in an equity proceeding. This loses sight of the fact that appellants-plaintiffs, filed a complaint in equity to prevent the defendants-appellees' conducting any meeting in which Mr. Sablosky would use his shares of stock to vote, as he was not in agreement with Samuel Shapiro. Of course, Samuel Shapiro could not vote the stock owned jointly with Edna Shapiro, as she was in disagreement with her husband and in agreement with Mr. Sablosky. The defendants answered the complaint and raised, by new matter, questions which were decided by the chancellor. The fact of filing the agreement as contended for by the appellants, did not limit the scope of the equity proceedings. It is well recognized that when equity takes jurisdiction, it will resolve the entire litigation. *Wortex Mills v. Textile Workers U. of A.*, 380 Pa. 3, 109 A. 2d 815 (1954), and cases cited therein. If the proceedings had been brought solely for the purpose

of determining the validity of the election of November 26, 1962, it would not be proper. The proper procedure would have been quo warranto and not equity. However, this was not the sole purpose of the equity action in this case. The validity of the meeting of November, 1962, had to be decided in the course of determination of all the issues.

Appellants also complain that the bylaws of Arcadia were ignored in the fixing of the date for the special meeting of shareholders. This is also without merit, since all of the shareholders had notice of the meeting and appellant Samuel Shapiro chose not to be present or to be represented by proxy. He could not have voted the 40 shares of stock held jointly with his wife, Edna, since she had given notice that she was not in agreement with her husband.

Appellants call attention to the fact that a petition filed by Morton J. Sablosky to restrain a holding of an election in November, 1963, was not disposed of. This petition became moot by the chancellor's order filed on January 27, 1964, when the matter sought to be raised by that petition was disposed of.

The decree is affirmed at the cost of appellant, Samuel Shapiro.

Mr. Chief Justice BELL and Mr. Justice ROBERTS concur in the result.

Mr. Justice EAGEN dissents.