Edward Hendrick et al., Appellants, *v.* Gerald Jackson et al., Appellees.

Argued February 6, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*John Mattioni,* Deputy City Solicitor, with him *Howard D. Scher,* Assistant City Solicitor, *S. Jay Sklar,* Assistant City Solicitor, and *Martin Weinberg,* City Solicitor, for appellants.

*David Rudovsky,* with him *Kairys & Rudovsky, Bruce E. Endy* and *Joseph Wenk,* Community Legal Services, Inc., for appellees.

OPINION BY PRESIDENT JUDGE BOWMAN, August 31, 1973:

There are two basic issues raised in this appeal from an order of the Court of Common Pleas of Philadelphia, which decreed that the Philadelphia prison system as it is presently being operated is in violation of the Eighth Amendment prohibition against cruel and unusual punishment in its treatment of its inmates and detainees.

In deciding whether or not the lower court erred as a matter of law in concluding that the present prison conditions constitute a violation of Eighth Amendment rights, we do so within the scope of our review. In a recent decision, this Court exhaustively considered this issue. The scope of review is limited to manifest error or clear abuse of discretion. If there is sufficient evi-

dence to justify the findings and if reasonable inferences and conclusions are derived therefrom, the Chancellor's decision will stand. *Ross v. Philadelphia Federation of Teachers,* 8 Pa. Commonwealth Ct. 204, 301 A. 2d 405 (1973).

A careful review of the record below indicates that the extensive findings of fact are based on substantial evidence and thus will be sustained. As Judge SPAETH, one of the three hearing judges, points out in his opinion at page 4: ". . . on every important matter there is little or no disagreement, and often the evidence in support of a particular finding is overwhelming."

Having found that there is sufficient evidence to support the findings of fact, the next consideration is whether or not those conditions found to exist constitute, as a matter of law, a violation of the Eighth Amendment.

The leading Pennsylvania decision in this area is *Commonwealth ex rel. Bryant v. Hendrick,* 444 Pa. 83, 280 A. 2d 110 (1971). Although the *Bryant* appeal resulted from the granting of habeas corpus relief and this case has arisen in equity, *Bryant* is controlling in the instant case on the issue of what facts constitute cruel and unusual punishment. The Supreme Court in *Bryant* cites with approval and relies on *Holt v. Sarver,* 309 F. Supp. 362 (E.D. Ark. 1970), *aff'd,* 442 F. 2d 304 (1971), on the Eighth Amendment constitutional issue. *Holt,* like the instant case, was a class action in equity involving a fact situation similar to both *Bryant* and the case at bar. Since the Supreme Court has approved the *Holt* decision as regards Eighth Amendment principles and that case arose in equity, *Bryant* is, therefore, directly applicable here.

In *Bryant, supra,* the Court, quoting the lower court, states at 93, 280 A. 2d at 115: ". . . petitioners have been imprisoned in overcrowded, poorly equipped, wet, badly ventilated, and verminous cells." And at pages

94 and 95 of its opinion, 280 A. 2d at 115-16, the Court discusses the inadequate medical care, threat of assault, both sexual and otherwise, in addition to the other living conditions.

In determining whether such conditions constitute cruel and unusual punishment, the Supreme Court indicates a test to be employed. Quoting from *Jackson v. Bishop,* 404 F. 2d 571, 579 (8th Cir. 1968), it said in *Bryant* at 97-98, 280 A. 2d at 117: " 'In summary . . . we have a flat recognition that the limits of the Eighth Amendment's proscription are not easily or exactly defined, and we also have clear indications that the applicable standards are flexible, that disproportion both among punishments and between punishment and crime, is a factor to be considered, and that broad and idealistic concepts of dignity, civilized standards, humanity and decency are useful and usable.'

"Using the above as a litmus test. . . ." The facts as found by the lower court in the instant case are similar to those of Bryant. In fact, both decisions concern the same institution—Holmesburg. Therefore, we affirm the lower court's conclusion that the current conditions in Holmesburg constitute cruel and unusual punishment.

A most difficult issue involves that portion of the order of the lower court which provides for the appointment of a master and sets forth in broad terms the scope and nature of his responsibilities and those of the parties, particularly the defendants, to the master. The order concluded by stating that the master's report and recommendations will be considered by the court in "framing its final decree."

Appellants contend that the appointment of a master under these circumstances and the nature of responsibilities assigned to him is without authority in law.

We are asked to resolve this issue prior to any master having been appointed let alone having made a report and recommendations leading to a final decree; yet, it is before us on appeal from a "final decree." Although not entirely clear from the record, this unorthodox posture of the case appears to have resulted from exceptions having been filed to the decree nisi which were overruled following argument thereon and a "final decree" then being entered. Thus, as a matter of law we have an appealable order in the technical form of a "final decree" but are asked to resolve this legal issue when the case is far from final as a matter of fact.

The use of masters or referees by courts except in most unusual cases and within narrow limits has been strongly condemned as an "abdication of the judicial function depriving the parties of a trial before the court. . . ." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957). For much the same reason, the history of Pennsylvania jurisprudence reveals an increasingly tight rein being placed upon the use of masters by our courts as exemplified by Pa. R.C.P. Nos. 1514 and 1515 and their predecessor Equity Rule 65.

Pa. R.C.P. No. 1514, governing equity actions, now provides: "Except as otherwise provided by Act of Assembly or rule of the Supreme Court, no examiner, master or auditor shall be appointed."

Unless the appointment of a master in this case to perform the functions assigned to him by the lower court falls within an exception to this Rule, his appointment is without authority in law. The only exception possibly applicable here is that found in Pa. R.C.P. No. 1515, which provides: "In action involving complicated accounts, or questions requiring the evidence of experts, the court may employ an accountant or other expert to aid in the proper disposition of the action. The report or evidence of such accountant or

other expert shall be available to any party and he shall be subject to examination or cross-examination by any party. He shall be paid reasonable compensation for his services."

The leading case interpreting these rules, and the one upon which the lower court relies in providing for a master in this case, is *Arcadia Theatre Co. v. Sablosky,* 418 Pa. 34, 209 A. 2d 375 (1964). In addition to discussing the historical role of a master, the growing concern over the use of a master as impinging upon the judicial function and the adoption of new procedures to rectify the problems, our Supreme Court, after observing that the dominant issue as to the propriety of the use of a master in an equity case "is the extent of the master's participation" states, "A master may not be appointed to take testimony, make findings of fact and suggest a decree. He cannot make a judicial determination." *Arcadia, supra,* 418 Pa. at 40, 209 A. 2d at 378.

In discussing the exception found in Equity Rule 65 (as restated in Pa. R.C.P. No. 1515) and approving the appointment of a master by the lower court in that case, the Supreme Court, quoting *Rowley v. Rowley,* 294 Pa. 535, 540, 144 A. 537, 539 (1928), continued:

" 'But express provision was made by Rule 65, where the final decree for an accounting had been entered, to name experts or assessors to pass on debits and credits, and strike the balance due, . . . . "Whether the person to whom the case is sent be called an assessor, an auditor, a referee or a master, is of no importance, the substance of the matter is the right of the court in exceptional cases to avail itself of exceptional assistance, in executing or supervising the execution of the details of its work, not requiring the exercise of exclusively judicial functions" [citing Commonwealth ex rel. v. Archbald, 195 Pa. 317, 320, 46 A. 5, 6 (1900)].' " 418 Pa. at 42, 209 A. 2d at 378.

"Of course, master in chancery had been abolished in 1894, and any functions of a judicial nature as performed by a master in chancery were abolished. The name master, however, has persisted with sometimes well-defined duties, and at other times with no particular definition. In this case, however, the parties, by stipulation, outlined the duties of Mr. Ott, who was named master. His function by that agreement was to perform certain duties under the jurisdiction of the chancellor, and not as a substitute for the chancellor. It is necessary in some equitable actions for the court to avail itself of persons who can see to the performance of certain duties, either defined and outlined by the court, or by agreement of the parties and approved by the court, just so long as those duties are not judicial. The record indicates that Mr. Ott supervised the collection and distribution of receipts of the theatre, and otherwise supervised the personnel operating the theatre. We held numerous meetings and conferences and decided upon the time to hold the meeting of shareholders for the purpose of electing the Board of Directors, and acted as chairman and judge of that election when new directors were elected. In the performance of his duties, it was necessary for him to acquaint himself with the numerous corporate and legal maneuverings of the parties, which required him to examine the minutes of meetings and all of the incidental legal papers emanating from the activities of the parties engaged in this litigation. The record indicates the chancellor had before him all of the evidence and documents involved in this litigation that were material to the determination of the controversy." 418 Pa. at 47-48, 209 A. 2d at 381.

In the case at bar the Chancellor, quoting from *Arcadia,* observed that, "If ever there was an 'exceptional case' in which the court needed 'to avail itself of

exceptional assistance' it is the present case." (Page 252 of Judge SPAETH's opinion.)

Although the case at bar may well be considered to be an "exceptional case," it is not within the class of exceptional cases reviewed and recognized by the Supreme Court as requiring the assistance of masters,[1] nor more importantly, is the pedestrian or exceptional nature of a case the controlling test for determining the propriety of the use of a master and the role he is called upon to perform. Our Supreme Court has unqualifiedly said that a master may not be appointed to take testimony, make findings of fact or suggest a decree and has declared that the dominant issue is the extent to which a master by reason of his assigned duties and responsibilities will participate in the case. *Arcadia, supra.*

Because of the unusual posture of the case as it is now before us, we face this issue prospectively in that the master remains to be appointed and the role assigned to him remains to be performed. Having carefully considered the lower court's opinion, its findings of fact and conclusions of law and its order, we are, nevertheless, of the opinion that even viewing the master's role prospectively, his appointment to perform the role assigned to him is without authority in law and therefore improper.

The master's role, as envisioned by the lower court, would involve him and ultimately the court in an extensive overhaul of the entire prison system. As Judge SPAETH states in his opinion (page 253): ". . . it would be 'manifestly impossible' for the Court to anticipate and to appraise all of the factors requiring

---

[1] *See Darlington v. Reilly* (No. 1), 375 Pa. 578, 101 A. 2d 900 (1954) ; *Rowley v. Rowley*, 294 Pa. 535, 144 A. 537 (1928) ; *Rolshouse v. Wally*, 272 Pa. 506, 116 A. 474 (1922) ; *Deal v. Erie Coal & Coke Co.*, 248 Pa. 48, 93 A. 829 (1915) ; *Commonwealth v. Archbald, supra.*

consideration in administering the prisons, and to draft rules accordingly. This is not the function of the court but of the prison officials. . . ."

Despite this disclaimer and others voiced by the lower court that it intends to draft prison rules or that the master will perform any judicial function, an analysis of the role assigned to the master set forth in the opinion and decree nisi discloses that if he is to perform the task assigned to him, the master will clearly be performing one or more judicial functions and that the lower court intends to issue its "final decree" based at least in part upon the master's report.

After discussing at some length the ills of the prison system in general and the need for a coordinate effort by multiple agencies sharing the responsibility for its administration, the lower court revealingly observes:

"From these considerations it is apparent that were the Court to focus its decree solely upon the prisons, the decree would be ineffective, indeed almost futile. To be of worth, the decree must not only require defendants to fulfil their Constitutional and statutory responsibilities to the limits of their abilities; it must encompass the entire criminal justice system and bring together those responsible for its administration.

. . . .

"As the Court has reflected upon the comprehensive nature of the ills of the prisons, the complexity of formulating solutions, and the need to bring together and to coordinate the various parts of the criminal justice system, it has concluded that the most appropriate procedure is to retain jurisdiction and to appoint a master who will be charged with the formidable task of collecting and compiling all relevant data, and, thereafter, with all of the parties, formulating recommendations to the Court responsive to the record and the Court's Findings of Fact." (Pages 249, 250 of printed lower court opinion.)

Beyond question then, the lower court envisions the master as an extension of the court to receive information, advice, opinions, viewpoints, statistical data and recommendations in performing "the formidable task of collecting and compiling all relevant data" from a host of sources not only directly concerned with the prison system in question but also concerned with the broad spectrum of the criminal justice system as well. And this is apparently to be done without an opportunity before the master on the part of the litigants to directly participate in its gathering, to question its materiality or relevancy to the issues of the case, or to have it exposed to cross-examination. Nor is it evident that whatever is ultimately contained in the master's report and the "decisions of the master" with respect thereto (page 253 of the lower court opinion) will be all of the information and data he received rather than his determination of what is important, relevant or material and his "decisions" with respect thereto. Surely such a role casts the master in a judicial role and materially denies to litigants the protection of their rights incident to an adversary proceeding.

It is not the function of the judiciary to administer a prison system, to supervise its administration, or to dictate how a prison system shall operate. *Commonwealth ex rel. Bryant v. Hendrick, supra.* The admittedly complex social-economic problems confronting this Commonwealth and the nation at large in administering a prison system and the priorities to be assigned prisoner rehabilitation, punishment and the protection of the public from those who violate our criminal laws are problems to be solved by the executive and legislative branches of government. Nor should the judiciary in the guise of adjudicating a particular case raising particular issues reach beyond the adversary proceedings before it and thereby directly involve itself in the larger problem underlying the legal issues involved for

which it has neither the means, the power, nor, indeed, the right to intervene.

In the instant case the basic issue is whether the physical facilities and operation of the prison system in question are violative of both statutory law and the rights of detainees and prisoners to protection from cruel and unusual punishment.

The evidentiary record, consisting of 3,189 pages, demonstrates that the case was exhaustively and thoroughly tried with the parties presenting all evidence conceived to be relevant and material to the issues. The Chancellor was equally exhaustive and thorough in his review and analysis of the evidence from which emerged extensive and specific findings of fact with frequent supportive discussion.

We see no real or vital need for additional evidence. If additional information is needed by the court to frame its final decree, there is no reason why the court itself cannot order the required information to be submitted directly to it and made a part of the record, thus establishing with certainty all additional factors considered by the court in framing its final decree. This was the procedure adopted by the courts whose decisions were cited by the lower court here in its discussion of the relief to be granted. A master was not appointed in those cases. *See Holt v. Sarver, supra; United States v. Alsbrook,* 336 F. Supp. 973 (D.D.C. 1971).

The "final decree" of the lower court is affirmed except that portion providing for the appointment of a master, which portion is reversed. The case is remanded to the lower court for further proceedings consistent with this opinion.