[Crim. No. 6965.   In Bank.   June 12, 1962.]

In re MARVIN D. JONES on Habeas Corpus.

Joseph A. DeCristoforo, under appointment by the Supreme Court, for Petitioner.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Respondent.

PETERS, J.—The petitioner, Marvin D. Jones, seeks habeas corpus on the ground that on two occasions certain named custodial officials at Folsom State Prison, where Jones was incarcerated[1] inflicted cruel and inhuman punishment upon him. The petition, filed in propria persona in August of 1961, alleges that in October 1960 an Islam scrapbook was confiscated from him by Lieutenant Campoy, who then, together with Lieutenants Piper, Johnson and Vance, proceeded to beat and kick petitioner in the face, stomach and groin. The petition also alleges that in January 1961 petitioner was beaten and knocked unconscious by Sergeant Valley and Lieutenant Piper, and Officers Williams and Lonzo. In the course of this beating, he alleges that his right eye was knocked out of its socket. It is alleged that these acts of brutality were directed against him solely because he is a member of the Black Muslim religious group. It is also alleged that his right of access to this court was interfered with.

Insofar as this petition charges the infliction of cruel and inhuman punishment or interference with the right of access to the courts, it states a good cause for relief by way of habeas corpus. These points have been fully discussed in the case of *In re Riddle, ante,* p. 848 [22 Cal.Rptr. 472, 372 P.2d 304], this day filed. What was there said on these points need not be here repeated.

It is also true that the allegations of racial and re-

---

[1]At the oral argument it developed that Jones was paroled shortly before the hearing. The Attorney General properly concedes that such parole does not render this proceeding moot. Petitioner, although not in direct custody, is under restraint. (Pen. Code, § 3056; *Matter of Application of Stanton,* 169 Cal. 607, 610 [147 P. 264]; *In re Taylor,* 216 Cal. 113, 115 [13 P.2d 906]; *People* v. *Denne,* 141 Cal.App.2d 499, 507 [297 P.2d 451].) Actual detention in prison is not an indispensable condition precedent to the issuance of habeas corpus, and persons on parole or on trial are, in a proper case, entitled to its issuance. (*In re Petersen,* 51 Cal.2d 177, 181-182 [331 P.2d 24]; *In re Bandmann,* 51 Cal.2d 388, 396-397 [333 P.2d 339]; *In re Marzec,* 25 Cal.2d 794, 797 [154 P.2d 873]; *In re Harincar,* 29 Cal.2d 403 [176 P.2d 58].)

ligious discrimination state a good cause for relief by way of habeas corpus.[2] A person is not deprived of all of his constitutional rights by reason of his incarceration for a felony. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any *person* of life, liberty, or property, without due process of law; nor deny to any *person* within its jurisdiction the equal protection of the laws." (Emphasis added.) A convicted felon, although civilly dead (see Pen. Code, §§ 2600-2604) is nevertheless a "person" entitled to the protection of the Fourteenth Amendment. (*McCollum* v. *Mayfield,* 130 F.Supp. 112, 115-117; *Gordon* v. *Garrson,* 77 F.Supp. 477, 479.) There are many cases upholding the right of such persons to equal protection (*Dowd* v. *Cook,* 340 U.S. 206 [71 S.Ct. 262, 95 L.Ed. 215, 19 A.L.R.2d 784]; *Cochran* v. *Kansas,* 316 U.S. 255 [62 S.Ct. 1068, 86 L.Ed. 1453]) and to due process (*Ex parte Hull,* 312 U.S. 546 [61 S.Ct. 640, 85 L.Ed. 1034]; *United States* v. *Jones,* 207 F.2d 785; *Harper* v. *Wall,* 85 F.Supp. 783). Freedom from religious discrimination, either in a state prison (*Pierce* v. *La Vallee,* 293 F.2d 233; Note (1962) 75 Harv.L.Rev. 837) or in a federal penitentiary (*Sewell* v. *Pegelow,* 291 F.2d 196) has also been protected by the federal courts. Reasonable regulation of these rights, however, is permitted (*In re Ferguson, supra,* 55 Cal.2d 663; *People* v. *Ray,* 181 Cal.App.2d 64, 69 [5 Cal.Rptr. 113]; *Davis* v. *Superior Court,* 175 Cal.App.2d 8, 20 [345 P.2d 513]; *Akamine* v. *Murphy,* 108 Cal.App.2d 294 [238 P.2d 606]; *Reynolds* v. *United States,* 98 U.S. 145 [25 L.Ed. 244]; see 2 Emerson & Haber, Political and Civil Rights in the United States (2d ed. 1958) pp. 1184-1187; see also *People* v. *Wilkins,*

[2] There is language in *In re Ferguson,* 55 Cal.2d 663, 670-671 [12 Cal. Rptr. 753, 361 P.2d 417], to the effect that "petitioners are not protected by the guarantees of religious freedom set forth in article I, section 4, of the California Constitution, since they are incarcerated in an institution for 'persons convicted of felonies,' and subject to the above exception of article X, section 7." This was an overstatement of the law as it existed in April of 1961 when the *Ferguson* case was decided. This is so because the exception of article X, section 7, referred to in the quotation, *supra,* and quoted in the opinion, formerly read: "Notwithstanding anything contained elsewhere in this Constitution" the Legislature is authorized through the Department of Corrections, to impose regulations on inmates of penal institutions without regard to the other guarantees in the Constitution. As a matter of fact, the clause commencing "Notwithstanding anything contained elsewhere" quoted above was repealed on November 8, 1960. This amendment was not called to our attention in the *Ferguson* case. Although the quoted statement is, therefore, in error this in no way affects the holding in *Ferguson* that the prison regulation there involved was reasonable. (See 9 U.C.L.A. L.Rev. 501, 504.)

26 Misc.2d 1090 [210 N.Y.S.2d 309]; *McBride* v. *McCorkle,* 44 N.J. Super. 468 [130 A.2d 881]).

For these reasons, the petition properly alleged grounds for the issuance of an order to show cause. Such an order was issued, and counsel appointed for petitioner.

The return to the order to show cause contradicted the petition in many material respects. It denied that any force was used by respondent on petitioner in October of 1960. It conceded that some force was used on petitioner on January 24, 1961, but alleged that only that amount of force was used as was necessary to enforce compliance with proper prison regulations. It also denied the allegations of racial and religious discrimination and denied that there had been any improper interference with petitioner's right of access to the courts.

Because of these conflicts, the Honorable J. T. B. Warne was appointed as a referee of this court. After a full hearing (the hearing lasted nine days, during which a transcript of over 800 pages was compiled) the referee found:

"1. . . . that force was used against petitioner by certain prison authorities or personnel on October 14, 1960, and also on January 24, 1961.

"2. . . . that petitioner's belligerent conduct toward the correctional officers and his refusal to obey prison rules and regulations reasonably occasioned the use of force in each instance; that the degree of force used and the circumstances concerning each instance are not as alleged by the petitioner but that with the exception of respondent's denial of the use of any force pertaining to the October 14, 1960 instance the facts and circumstances are as set forth in their return to the order to show cause in this proceeding. Concerning the October incident I find that some force was used in moving petitioner to the restricted area but it is not true as alleged by petitioner that at that time he was beaten, kicked and otherwise physically abused.

"3. . . . that the force which was used upon petitioner was reasonably necessary to compel him to comply with prison rules and regulations in each instance, notwithstanding the fact that on or about January 24, 1961 petitioner sustained an injury to his right eye, commonly termed a 'black eye' which caused a swelling of the area to the extent that the eye was closed from the ecchymosis. The injury occurred while petitioner was being escorted from the prison hospital to the Adjustment Center. During that period of time petitioner

was in a fighting mood, yelling, kicking and swinging his fists at the correctional officer, and it was necessary to use 'come-along holds' as a means of taking him to the Adjustment Center. Under the circumstances it is my finding and conclusion that no more than reasonable force was used in order to compel compliance with prison rules and regulations, and the commands of the Correctional Officers involved. I further find that petitioner sustained no permanent injury to either eye and that both eyes are normal.

"4. . . . that no slanderous epithets were directed at petitioner on any of the occasions alleged in his petition, or at any other time, by any of the prison authorities or personnel.

"5. . . . that no attempt was made on June 16, 1961, as alleged by petitioner, or at any other time, by any of the prison authorities or personnel to intimidate petitioner because of material contained in any document addressed by petitioner to any court.''

As pointed out in *In re Riddle, supra, ante,* p. 848, these findings, even though supported by the evidence, and entitled to great weight, are not binding on this court. This court is required to pass on the weight of the evidence.

Jones testified that in October 1960 Lieutenant Campoy and others searched his cell and confiscated a Muslim scrapbook. He was then taken to a cell in the restricted area, the ''dungeon'' in prisoner parlance, and was beaten with baseball bats and kicked by Lieutenants Campoy, Johnson, Piper, and Officers Williams, Campoy and Lonzo. He was then left naked in the cell for three days and nights.

Jones also testified that about January 23d, four guards, armed with clubs, took him to another cell and jabbed him with the clubs on the way. The next day Jones went to the hospital for a reason not connected with this case. As he left the hospital several officers pulled and dragged him through Building Two down a flight of stairs and into the mess hall. While in the mess hall he was struck several times. He was then carried to the Adjustment Center. There he tried to fend off a blow from Lonzo, and was jumped upon by six officers who proceeded to beat and kick him in the face, stomach and groin. During this beating his right eye was knocked out of its socket. The next day he went to the hospital and was required to stay there for two weeks.

Jones further testified that he tried to file a petition for a writ of habeas corpus in February of 1961, but that the officials refused to mail it to the court. He submitted another

(the instant petition) in March of 1961 but it was not mailed until June 1961.

Jones stated that he has been frequently threatened by Lonzo, Williams and Piper concerning his naming them in this petition. He claims that he has been frequently insulted both because he is a Negro and also because he is a Black Muslim.

He also testified that he was offered a parole in January 1962 by Clinton Duffy and C. J. Fitzharris, members of the Adult Authority, if he would drop the instant proceedings.

Some of the facts in reference to the January incident were corroborated by several inmates. Several substantiated Jones' testimony as to the circumstances under which he was then removed from his cell, and the fact that the guards were armed with clubs, and that they "poked" Jones with them. Several said that they heard the guards use abusive language toward Jones and ridicule him for being a Black Muslim. Several testified that they heard Lonzo threaten Jones for naming him in the instant petition, while others testified that they were warned not to testify for Jones and threatened with reprisals if they did so. One testified that he saw Jones being dragged through the mess hall on the day in question; that Jones was bloody and had his eye kicked out; that he saw the officers kicking Jones. Several other witnesses testified that they also observed such kicking. Petitioner's father testified that the warden admitted to him that the guards beat his son in January 1961; that in February 1961 his son had stitches around both eyes; that his son did not have a scar near his right eye when he entered prison in 1958.

All of these inmate witnesses were impeached on the not unreasonable ground of conviction of a felony.

The testimony produced by respondent, in most respects, was sharply contradictory.

Lieutenant Campoy testified that in October 1960 he did confiscate the scrapbook from Jones and removed Jones to another cell, but he stated that this was done to protect Jones from the other inmates, and that Jones went willingly and was not struck with a club or otherwise by anyone; that although Jones was stripped he was thereafter given clothing which he refused to put on; and that Piper and Johnson, two of the guards Jones said beat him on that occasion, were not even on duty and were not present on October 14, 1960. He not only denied striking Jones in October 1960 but denied hitting him on any other occasion; denied that he ever used

vile language addressed to Jones, and denied intimidating any of Jones' witnesses.

Lieutenant Vance also testified that no force was employed in October 1960, and that the prison log showed no unusual occurrences on the 14th.

There was considerable testimony concerning the January 1961 incident. All the custodial officers agree that Jones was yelling and screaming and disturbing the other inmates when he left the hospital on January 24, 1961, and had to be escorted to a "quiet cell." Some testified that he went quietly and that no force was used. Others testified that but a reasonable amount of force was used. All denied any religious discrimination or that they had interfered with Jones' access to the courts. Lieutenant Valley, and Officer Lonzo testified that Jones was acting in such a fashion that it was necessary to use certain judo holds on him to escort him to a cell; that when Jones got to the cell he refused to strip for purposes of a search (a standard procedure), and that about five officers tore his clothing off; that Jones was fighting, screaming and kicking; that he refused to put on the clothing offered him and that he was escorted with reasonable force to his cell. They testified that no custodial officer hit Jones, and that none of them was armed with a club. They admitted that when they left Jones in his cell his right eye was beginning to swell, but professed ignorance of the cause, hazarding a guess that Jones might have fallen on his face during the strip cell melee. Vance admitted that he kicked Jones' feet out from under him during that fight. Lonzo not only corroborated Valley in most respects, but further testified that he not only did not threaten Jones because of filing the instant petition, but did not even know it had been filed until he was ordered to appear at the referee's hearing. He contradicted Valley in that he denied not only that Jones' feet were kicked out from under him, but he testified that Jones' clothing was not torn from him but merely removed. He did not see Jones fall, and professed ignorance of the cause of the injured eye.

The warden denied that he had told petitioner's father that petitioner had been beaten. Clinton Duffy, and Cletus Fitzharris, the two members of the Adult Authority that Jones had testified offered him a parole if he would drop the instant proceedings, denied, unequivocally, that they had done so. They produced the records of the Adult Authority for the time in question to show that Jones did not even appear before the Authority at that time.

A photograph of Jones dated 2-4-58 shows Jones with a scar near his right eye. The Chief Medical Officer at Folsom introduced the hospital records of that institution for the appropriate periods. There is nothing in the records to show that in October 1960 Jones complained of or was treated for being beaten or kicked. The witness did testify that Jones was hospitalized after the January 1961 incident. The records show that Jones was then suffering from an abrasion of and a contusion to the right eye area; that the right eye was closed by swelling, and that Jones complained of pain in his eye and in his groin. No surgery or stitching was necessary. Jones was kept in the hospital for two weeks, during which an ice bag was applied to his eye. Jones was kept in the hospital for this period mainly because of his tensions and anxieties.

An independent eye doctor appointed by the referee testified that he examined petitioner's eyes in February 1962; that both eyes, although needing correctional glasses, which were furnished, were free from abnormalities; that the examination showed no evidence of injury; and that if the eye had been injured as described by Jones there would be evidence of it, and the eye permanently damaged.

The correctional officer in charge of the processing of inmates' writs, showed by his records that Jones applied for three writs in August of 1961, and not before, and that Jones never complained to him of having a writ held up.

In rebuttal Jones testified that the photograph dated 2-4-58 was in fact taken in 1961 after the beating, and substituted in the files for an earlier one.

Thus, the evidence was directly contradictory. There are opposing stories, each with certain inconsistencies and contradictions. The referee saw these witnesses and passed on their credibility. His findings are not binding on this court, but are entitled to weight. After reading the record it appears to us that the referee correctly appraised the evidence, and that his findings should be and are adopted as the findings of this court.

In weighing this testimony the following factors are worthy of note. The testimony of the independent eye doctor disproves Jones' testimony about having his eye kicked out of his head. His story about the claimed offer of a parole was denied by the two respected members of the Adult Authority involved, and by its records. Petitioner's claim that the photograph was substituted in the files is not convincing. The

records show that two of the guards charged as participants in the October 1960 incident were off duty on the day in question.

It is true that the testimony of some of respondents' witnesses contains some inconsistencies. Their stories differ in some details as to just what went on in the strip cell during the January 1961 incident, although all agree that Jones was a problem and a trouble maker. All the guards seem to have been reluctant to testify or to remember how Jones acquired the black eye. All denied that any force was used during the October 1960 incident, but the referee found to the contrary, and we agree with his finding. But we also agree with his finding that the force then used was reasonable and necessary to compel compliance with reasonable prison regulations. As to the January 1961 incident the overwhelming weight of the evidence shows that Jones was in a wild and belligerent mood when he left the hospital, and that force had to be and was used on him to get him to the Adjustment Center. There he started a fight when ordered to strip, and reasonable force was used to subdue him. The force used was not excessive, and there were no aftereffects from the beating.

The evidence is convincing that Jones was not persecuted because of his religious beliefs, and we so find.

With reference to the claimed interference with Jones' access to the courts the evidence is conflicting, but in our opinion the most credible evidence is that there was no such interference, and we so find.

Also, in weighing this evidence, all of the general factors discussed in *In re Riddle, supra, ante,* p. 848, should be and have been considered.

Tested by these standards, it must be held that petitioner has not sustained the burden of proof imposed upon him. The order to show cause is discharged, and the petition for habeas corpus is denied.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., White, J., and Dooling, J., concurred.