Commonwealth ex rel. Bryant *v.* Hendrick, Appellant.
Commonwealth ex rel. Goldstein *v.* Hendrick, Appellant.

84

Argued November 23, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*James D. Crawford,* Deputy District Attorney, with him *Paul R. Michel,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, *Arlen Specter,* District Attorney, for appellant.

*David Rudovsky,* Assistant Defender, with him *John W. Packel,* Assistant Defender, and *Vincent J. Ziccardi,* Defender, for appellee.

OPINION BY MR. JUSTICE EAGEN, August 2, 1971:

These appeals are by one Hendrick, Superintendent of the Philadelphia county prisons, from an order entered below granting habeas corpus relief to petitioners, Cephus Bryant [Bryant] and James Goldstein [Goldstein].

Both petitioners alleged that they were confined in Holmesburg Prison under conditions constituting cruel and unusual treatment, prohibited by the Eighth Amendment of the United States Constitution. At the time, Bryant was confined in Holmesburg in lieu of $3,500 bail while awaiting trial on an indictment charging him with burglary, larceny and receiving stolen goods. In addition, he was subject to a military detainer filed by the United States Marine Corps, charging him with being absent without leave from that organization. Goldstein was confined in lieu of $7,500 bail following his arrest for illegal possession of dangerous drugs.

Supporting their allegations that confinement in Holmesburg constituted cruel and unusual punishment, Bryant and Goldstein asserted that they were in grave danger of serious physical harm; that the conditions of the cells and other areas of the prison were substandard; and that their confinement resulted from the fact that they were too impoverished to post bail.

After an extended hearing, a three-judge court below made exhaustive findings of fact and based on these findings concluded that "the prison [Holmesburg] was a cruel, degrading and disgusting place, likely to bring out the worst in a man" and that after the riot which occurred therein on July 4, 1970, the prison "became a place ruled by cold-blooded terror".

The court ordered that Bryant and Goldstein be transferred within 48 hours to "some other prison" or failing that, to be discharged from custody. It tailored its order by additionally directing that no further petitions would be entertained for thirty (30) days to give the authorities an opportunity to begin to remedy conditions which led to the issuance of these writs.

Subsequently, Bryant was turned over to the custody of the military authorities. Goldstein was released from custody after posting bail in the reduced amount of $500, the reduction being ordered by the court. In the event he ever returned to the Philadelphia prison system, Goldstein was listed on the records of Holmesburg as having been transferred to the House of Correction.

While no one involved has raised the issue, in view of the fact that neither Bryant nor Goldstein are now confined in Holmesburg, the question of mootness looms on the horizon. However, we have ruled that an order entered in a habeas corpus proceeding discharging a prisoner from custody is reviewable on appeal. *Doyle v. Commonwealth ex rel. Davis,* 107 Pa. 20 (1884). Moreover, the public interest is so involved in the instant case that resolution of the merits is called for.

Appellant first contends that, even if the conditions at Holmesburg were as deplorable as the lower court found, relief through habeas corpus was improper. Admittedly, there is support for this position, but the lower court rejected it, and we conclude that under under the circumstances its ruling was wise and correct.

Traditionally in Pennsylvania and in many other jurisdictions, the writ of habeas corpus has functioned only to test the legality of the petitioner's commitment and detention. It was long held that the manner of his treatment and disciplining during confinement was not reviewable in habeas corpus proceedings. For example,

see *Commonwealth ex rel. Milewski v. Ashe,* 362 Pa. 48, 66 A. 2d 281 (1949), and *Commonwealth ex rel. Wright v. Banmiller,* 195 Pa. Superior Ct. 124, 168 A. 2d 925 (1961). On the other hand, some states adopted a more liberal view and permitted the use of habeas corpus to secure relief from conditions constituting cruel and unusual punishment, even though the detention was legal. For example, see *In Re Riddle,* 57 C. 2d 848, 22 Cal. Rptr. 472, 372 P. 2d 304, cert. denied, 371 U.S. 914, 83 S. Ct. 261 (1962); *Mahaffey v. State,* 87 Idaho 228, 392 P. 2d 279 (1964); *State ex rel. Cole v. Tahash,* 269 Minn. 1, 129 N.W. 2d 903 (1964); and Cf. *Hughes v. Turner,* 14 Utah 2d 128, 378 P. 2d 888 (1963). See also, *People ex rel. Brown v. Johnston,* 9 N.Y. 2d 482, 174 N.E. 2d 725 (1961), and *People ex rel. Rockey v. Krueger,* 306 N.Y.S. 2d 359 (1969).

The United States Supreme Court has also indicated in several instances that the use of the writ should not be restricted to a determination of the legality of the detention, and ruled that the writ may be utilized to secure relief from any restraint which violates freedoms considered basic and fundamental. *Peyton v. Rowe,* 391 U.S. 54, 88 S. Ct. 1549 (1968), and *Fay v. Noia,* 372 U.S. 391, 83 S. Ct. 822 (1963).

In *Fay v. Noia,* supra, Mr. Justice BRENNAN, speaking for the Court, outlined in scholarly fashion the development and history of "the great writ" and said [at 402] that "in a civilized society, government must always be accountable to the judiciary for a man's imprisonment" and [at 405] that "there was respectable common law authority for the proposition that habeas was available to remedy any kind of governmental restraint contrary to fundamental law."

And in *Harris v. Nelson,* 394 U.S. 286, 89 S. Ct. 1082 (1969), Mr. Justice FORTAS, speaking for the Court, aptly said at pages 290, 291:

"The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action. Its pre-eminent role is recognized by the admonition in the Constitution that 'The Privilege of the Writ of Habeas Corpus shall not be suspended. . . .' U. S. Const., Art. I, §9, cl. 2. The scope and flexibility of the writ—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes —have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

As Blackstone phrased it, habeas corpus is 'the great and efficacious writ, in all manner of illegal confinement.' As this Court said in *Fay v. Noia*, 372 U.S. 391, 401-402 (1963), the office of the writ is 'to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints.'" [Footnote omitted.]

Again in *Peyton v. Rowe*, supra, at p. 66, the Court appropriately said: " '[The writ] is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty.' "

Finally, in a host of decisions the federal circuit courts have adhered to the view that habeas corpus is available to seek relief from a confinement under conditions which amount to cruel and unusual punishment. See *Johnson v. Dye*, 175 F. 2d 250 (3d Cir. 1949) ;[1] *Coffin v. Reichard*, 143 F. 2d 443 (6th Cir.

---

[1] In *Johnson v. Dye*, habeas corpus was held proper in an action wherein the petitioner challenged his extradition from Pennsylvania to Georgia, because of cruel and unusual treatment pre-

1944); and, *Creek v. Stone*, 379 F. 2d 106 (D.C. Cir. 1967).

Therefore, despite what has been said in our previous decisions, we now conclude and rule that habeas corpus is available to secure relief from conditions constituting cruel and unusual punishment, even though the detention itself is legal. However, a caveat seems necessary.

We do not mean to indicate by our present ruling that it is the function of the courts to superintend the treatment and discipline of prisoners in penal institutions. This is the responsibility of those in charge of the prison itself and those officers, both state and local, who are given supervisory powers. We also emphasize that habeas corpus should not be entertained on the slightest pretext or merely to correct prison conditions which can be remedied through an appeal to prison authorities or to an administrative agency. But, we do mean that where the conditions of the confinement are so cruel and callous as the evidence in the present case establishes, the courts may grant relief through habeas corpus in order to protect the petitioner's fundamental and basic rights.

The appellant next contends that the hearing in the court below was tantamount to a broad inquiry into general prison conditions which is not proper in habeas corpus, but only in proceedings under the Civil Rights Act. There is no doubt but that the petitioners in this case could properly have sought relief under the Civil Rights Act. But, as the court below noted, the fact that a court may make a particular inquiry in one form does not necessarily preclude it from making it in another. Moreover, while the actions authorized under the Civil Rights Act and in habeas corpus do overlap,

---

viously inflicted upon him while a member of the Georgia "chain gang".

a court should never deny habeas corpus out of hand in the face of a request for relief based on a patent and serious deprivation of a constitutional right, particularly where the aggrieved person is incarcerated in a state or federal institution.

Several reasons militate against a contrary position. One such reason is that habeas corpus is the easiest and most accessible way for the ignorant and the impoverished to focus a court's attention on serious incursions of their rights.

*Johnson v. Avery,* 393 U.S. 483, 89 S. Ct. 747 (1969), graphically illustrates this point. This involved a proceeding on a state prisoner's "motion for law books and a typewriter" which the federal district court treated as an application for a writ of habeas corpus and subsequently granted. The State of Tennessee appealed, and on certiorari the Supreme Court held that a prison discipline regulation barring inmates from assisting other prisoners in preparation of petitions for post-conviction relief was invalid as in conflict with the federal right of habeas corpus.

Important for our purposes is what Mr. Justice FORTAS had to say in writing for the Majority. He noted with approval at pp. 487, 488, *Johnson v. Avery,* supra, that: "The District Court concluded that '[f]or all practical purposes, if such prisoners cannot have the assistance of a "jailhouse lawyer", their possibly valid constitutional claims will never be heard in any court. 252 F. Supp., at 784.'" and went on to state:

"Jails and penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited.

"In most federal courts, it is the practice to appoint counsel in post-conviction proceedings only after a petition for post-conviction relief passes initial judicial evaluation and the court has determined that issues are

presented calling for an evidentiary hearing [citations omitted]. . . .

"Accordingly, the initial burden of presenting a claim to post-conviction relief usually rests upon the indigent prisoner himself with such help as he can obtain within the prison walls or the prison system. In the case of all except those who are able to help themselves . . . the prisoner is in effect denied access to the courts unless such help is available." And as one commentator, in discussing cruel and unusual punishment claims by prisoners, has put it: "Society's decision to place a man in custody should not insulate from judicial review unlawful deprivations of his few remaining liberties, even though the unlawful component of the custody may not be sufficient, by itself, to constitute a custody. Unlike possible alternate remedies, . . . mandamus, injunction and so forth, habeas relief can be initiated by an unsophisticated petitioner to the federal courts. This comparatively easy access to habeas makes the writ a sound tool for relief of persons held in prison." Note, Development-Federal Habeas Corpus, 83 Harvard Law Review, 1038, 1086, 1087.

The appellant next urges that habeas corpus relief should not have been granted, because the evidence produced below related in most part to general prison conditions and the treatment of prisoners other than Bryant and Goldstein.

The record of testimony at trial was not reproduced. Page 17a of the record contains the following explanation:

"The hearing in this case consumed three court days during which relators produced the testimony of eighteen witnesses filling 682 pages of testimony.

"The Commonwealth, believing that the testimony was immaterial to the disposition of the case, produced no witnesses whatever.

"Since the Commonwealth's position remains unchanged, and since the findings of fact in the Opinion of the Court below are, with rare exception, supported by the testimony on the record, the Commonwealth is not here reproducing the notes of testimony of the hearing. Should these notes become relevant and material to the disposition of this appeal, the Commonwealth will reproduce them as a Supplemental Record for the Court upon the order of the Court." In his brief appellant further elaborated his position: "Allegations made by others on other [cell] blocks that they were attacked and beaten do not bear any relevance as to whether the petitioners in this case were subjected to cruel and unusual punishment as the petitioners themselves testified that they never suffered any physical abuse while confined at Holmesburg Prison." The lower court took immediate issue with such a contention: "The Commonwealth has contended that dreadful as the uncontroverted testimony demonstrates the conditions in prison to be, nevertheless, no writs should issue because the record does not demonstrate that petitioners have been beaten. The contention is to be regretted. It ignores the testimony, unchallenged by the Commonwealth, that petitioners have been imprisoned in overcrowded, poorly equipped, wet, badly ventilated, and verminous cells. But, if petitioners' cells were wholesome, the contention would be without merit; for the conditions surrounding the cells in which petitioners are confined constitute a threat to petitioners' lives; and to contend that evidence of these conditions is 'irrelevant' is like contending that if an untried prisoner were committed pending trial to a leper colony, he would be unable to secure the writ unless he proved that he had contracted leprosy." [Opinion lower court.]

Where the testimony taken in the court below is not made available on appeal by an appellant who is not excused from so doing because of indigency, or

other justifiable reasons, the scope of review by the appellate court is limited to a determination of whether or not the order appealed from is supported by the trial court's findings of fact. *Palumbo Appeal,* 166 Pa. Superior Ct. 557, 72 A. 2d 789 (1950). The findings of fact in the instant case amply support the lower court's order.

The lower court found the living conditions at Holmesburg "disgusting and degrading". The cells, originally built [between 1896 and 1920] to house one man, were seriously overcrowded.[2] The physical condition of the cells is most unwholesome. Rainwater leaks into the cells through the skylights when it rains, soaking the bed coverings. The cells are infested with cockroaches and sometimes rats. Blankets, kept for six months at a time, become filthy. Prisoners charged with serious crimes may and frequently are confined with prisoners charged with much lessor offenses. Mail between prisoners and their attorneys is censored.

Petitioners alleged that they were in fear of their own safety and well-being. The court found that there was an insufficient number of guards in proportion to the present prison population. Additionally, these men were inadequately trained. The degree to which the prison is unsafe is manifested by the incidents of sexual and other assaults, weapons, narcotics traffic and theft. The medical staff is inadequate. After the riot of July 4, 1970, a reign of cruel repression ensued. Prisoners were randomly selected for beatings by the guards. These beatings were administered with makeshift clubs [table legs, metal mop wringers] and continued until blood was flowing from the victim. Guards set up a gauntlet through which various prisoners had to run or crawl while being clubbed from all sides.

---

[2] Goldstein was confined to a cell with two other men; Bryant had one cellmate for the majority of his stay.

Such beatings continued night and day for two weeks after the riot.

Such was the milieu in which petitioners, Bryant and Goldstein, existed at Holmesburg while awaiting trial. Did such conditions attain the dubious stature of "cruel and unusual punishment" prohibited by the Eighth Amendment?

Just what constitutes cruel and unusual punishment in the constitutional sense is a matter which defies concrete definition. However, it has long been understood that the concept of cruel and unusual punishment is one of wide application, capable of acquiring new depth of meaning to conform to more enlightened concepts of criminal justice. In *Trop v. Dulles*, 356 U.S. 86, 78 S. Ct. 590 (1958), the Supreme Court wrote: "The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. *The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.* While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. . . . The Court recognized in [Weems v. United States, 217 U.S. 349 (1910)] that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." [Footnotes omitted.] [Emphasis supplied.] Id. at 99-101, 78 S. Ct. 597, 598.

The leading case involving prisoners' rights under the Eighth Amendment is *Holt v. Sarver,* 309 F. Supp. 362 (E.D. Ark. 1970) [Holt II], the latest in a series

of cases dealing with institutional life within the Arkansas Penitentiary system.[3] The fact that the case was a class action under the federal Civil Rights Act is of little moment since we are primarily interested in the Court's approach to the Eighth Amendment considerations.

Reviewing all of the allegedly unconstitutional practices, the Court explained in *Holt*, supra, 309 F. Supp. at 373: "The distinguishing aspects of Arkansas penitentiary life must be considered together. One cannot consider separately a trusty system, a system in which men are confined together in large numbers in open barracks, bad conditions in the isolation cells, or an absence of a meaningful program of rehabilitation. All of those things exist in combination; each affects the other; and taken together they have a cumulative impact on the inmates regardless of their status." Cf. *Sostre v. Rockefeller*, 312 F. Supp. 863, 871 (S.D.N.Y. 1970), where Federal District Judge MOTELY ruled that ". . . the totality of circumstances to which Sostre was subjected for more than a year was cruel and unusual punishment."

In *Holt*, supra, the Court found that use of the trusty guards and the open barracks system[4] were violative of the inmates' rights to be free from cruel and unusual punishment. The Court added, 309 F. Supp. at 381: "A convict, however cooperative and inoffensive he may be, has no assurance whatever that he will not be killed, seriously injured or sexually abused. Under the present system the state cannot protect him." Do not the find-

---

[3] See also, *Talley v. Stephens*, 247 F. Supp. 683 (E.D. Ark. 1965); *Jackson v. Bishop*, 404 F. 2d 571 (8th Cir. 1968); *Holt v. Sarver*, 300 F. Supp. 825 (E.D. Ark. 1969) [Holt I].

[4] To be noted is the fact that Holmesburg has an open cell system, whereby the cells on each block are left open during the day, allowing prisoners to walk from cell to cell and, incidentally, making homosexual rapes and other assaults easier to commit.

ings of fact here make clear that much the same could be said of Holmesburg?

In the Holt Court's estimation, confinement itself within a given institution may amount to a cruel and unusual punishment prohibited by the Constitution where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people, even though a particular inmate may never personally be subject to any disciplinary action. His very confinement "in population" is a violation of rights under such circumstances.

Such a rationale effectively renders nugatory the appellant's claim that, since neither Bryant nor Goldstein were physically abused while confined in Holmesburg, the writ should not issue.

That the Eighth Amendment is a vital, living principle can be seen in a series of decisions of fairly recent vintage.

Minimum standards of sanitariness and living conditions in prison were held to be constitutionally mandated in *Jordan v. Fitzharris*, 257 F. Supp. 674 (N.D. Cal. 1966), and *Wright v. McMann*, 387 F. 2d 519 (2d Cir. 1967). Censorship of communications between inmates and their attorneys was declared invalid in *Sostre v. Rockfeller*, supra, and *Burns v. Swenson*, 300 F. Supp. 759 (W.D. Mo. 1969). Punishment for giving legal assistance to fellow inmates was prohibited in *Johnson v. Avery*, supra, and *Wainwright v. Coonts*, 409 F. 2d 1337 (5th Cir. 1969). Corporal punishment as a disciplinary measure by means of the strap was barred in *Jackson v. Bishop*, supra n. 3.

In *Jackson v. Bishop*, supra n. 3, then Judge, and now Mr. Justice BLACKMUN, trenchantly wrote, 404 F. 2d at 579: "In summary . . . we have a flat recognition that the limits of the Eighth Amendment's proscription are not easily or exactly defined, and we also have clear indications that the applicable standards are

flexible, that disproportion both among punishments and between punishment and crime, is a factor to be considered, *and that broad and idealistic concepts of dignity, civilized standards, humanity and decency are useful and usable."* [Emphasis supplied.]

Using the above as a litmus test, we conclude that conditions at Holmesburg deprived the petitioners of the right to be free from cruel and unusual punishment, a right to which even in their confinement they were legally entitled [*In Re Jones,* 57 Cal. 2d 860, 372 P. 2d 310 (1962)], and the deprivation of which made their imprisonment more onerous than the law allows.

The order transferring the prisoners was also correct, since 12 P.S. §1906 states: "After hearing, the judge shall dismiss the writ, order the discharge of the relator, *or make such other order as shall be appropriate."* (Emphasis supplied.)

As the Court wrote in *Holt v. Sarver,* supra, at 385: "Let there be no mistake in the matter; the obligation of the Respondent to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or, upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States." Philadelphia is under an equal burden.

Order affirmed.

Mr. Justice COHEN took no part in the decision of this case.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I agree, as I assume virtually everybody does, that many of the prisons today are filthy, unhealthy, oppressive and often shocking, and for various reasons the safety and security of many inmates are sometimes in jeopardy. These disgraceful conditions are principally

the result of (1) too few prisons and (2) insufficient funds (a) to modernize and humanize the conditions in the present prisons and (b) to adequately protect the welfare and safety of the inmates and provide essential prison reforms, including more and better recreation facilities, and realistic programs of rehabilitation.

Two questions are involved: (1) do the general prison conditions constitute a violation of the Eighth Amendment of the Constitution of the United States which prohibits "cruel and unusual punishment," and (2) will habeas corpus lie to correct all these outrageous and intolerable prison conditions?

Although these cases seem moot, and it is very doubtful whether habeas corpus will lie,* I believe that because of the tremendous importance of the issues involved we should consider them on their merits. Unfortunately, under the Majority Opinion, many prisoners in Holmesburg Prison and in other prisons in Pennsylvania would, under a writ of habeas corpus, have to be *discharged* or transferred to a slightly better prison, solely because of confinement in a prison under conditions which are intolerable. However, it is a far stretch of the Constitution to hold that these general prison conditions amount to "cruel and unusual punishment."

It is a matter of common knowledge that many prisons are greatly overcrowded and provide deplorable living conditions, and many prisoners live in fear of dangerous inmates. Do these general prison conditions throughout our State compel a Court to hold, forgetting realities, that because of the racial and homosexual and other inhuman practices and the awful conditions existing therein, imprisonment in such a

---

* See the Pennsylvania decisions set forth in the Majority Opinion, which support my view.

prison of every inmate accused or convicted of crime "constitutes cruel and unusual punishment" in violation of the Constitution? Notwithstanding Justice EAGEN'S humane approach, I believe the holding of the Court is so unrealistic and Constitutionally farfetched that I am compelled to dissent.