Americo RIVERA, Appellant

v.

PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al., Appellee

Andy Torres, Appellant

v.

SCI–Pittsburgh Superintendent Philip Johnson, Appellee

Superior Court of Pennsylvania.

Submitted Sept. 30, 2003.

Filed Nov. 21, 2003.

Thomas N. Farrell, Pittsburgh, for Rivera and Torres, appellants.

Jon J. Talaber, Camp Hill, for PA Dept. of Corrections, appellee.

Raymond Dorian, Camp Hill, for Johnson appellee.

Before: JOYCE, BENDER and POPOVICH, JJ.

BENDER, J.:

¶ 1 Americo Rivera and Andy Torres (Appellants) appeal from the trial court's October 7, 2002 orders denying their petitions for writs of *habeas corpus*.[1] For the reasons that follow, we affirm.

¶ 2 Both Appellants are presently inmates in the Special Management Unit (SMU) at the State Correctional Institution (SCI) in Greene County. Previously, they were housed in the Long Term Segregation Unit (LTSU) at the SCI in Pittsburgh. In June of 2000, while at SCI–Pittsburgh, both Appellants filed petitions for writs of *habeas corpus,* alleging that the conditions of their confinement in the LTSU constituted cruel and unusual punishment "in contravention of the Eighth Amendment of the United States Constitution, the Pennsylvania Constitution and Pennsylvania law." Trial Court Opinion (T.C.O.), 10/7/02, at 2. The cases were assigned to the Honorable Robert E. Colville, who appointed counsel to represent Appellants. Joint evidentiary hearings were held at SCI–Pittsburgh, where Judge Colville toured the facility, including the LTSU. However, following the hearings and the submission of "a large volume of evidence in support of [Appellants'] claims, [the trial court was] constrained to find that the conditions of [Appellants'] confinement, taken singly or together, although decidedly unpleasant and at times harsh, [did] not rise to the level of cruel and unusual punishment and [is] not unconstitutional." *Id.*

¶ 3 Thereafter, Appellants filed their appeals to this Court, raising a single issue: "Whether the trial court erred in denying the petitions for writ of *habeas corpus?* " Appellants' brief at 4. Appellants present a two-fold argument. First, they contend that, although they are no longer housed in the LTSU, the issue is not moot because the conditions existing in the LTSU continue to exist and that the Department of Corrections could send them back. Secondly, Appellants acknowledge that the trial court's findings are supported by the evidence of record and are not in dispute; however, they contend that the trial court's conclusion that the conditions do not rise to the level of constitutional violations is error.

¶ 4 Initially, we must address the mootness issue, because Appellants are no longer housed in the LTSU.

As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. In that case, an opinion of this Court is rendered advisory in nature. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.

*In re D.A.,* 801 A.2d 614, 616 (Pa.Super.2002) (*en banc* ) (citations and quotation marks omitted). "It is impermissible for courts to render purely advisory opinions. In other words, judgments or decrees to which no effect can be given will not, in most cases, be entered by this

---

1. These matters were consolidated *sua sponte* by order of this Court, dated November 19, 2002. Additionally, it is apparent that this Court has jurisdiction to decide this matter in accordance with 42 Pa.C.S. § 762(a)(1). *See also Commonwealth, Department of Corrections v. Reese,* 774 A.2d 1255 (Pa.Super.2001).

Court." *First Union v. F.A. Realty Investors Corp.*, 812 A.2d 719, 724 (Pa.Super.2002 (quoting *Erie Ins. Exch. v. Claypoole*, 449 Pa.Super. 142, 673 A.2d 348, 352 (1996)). Despite a determination that a case is moot,

> [t]his Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court.

*Id.* at 724 (citing *Erie Ins. Exch.*).

¶ 5 We are persuaded that, because Appellants could be returned to the LTSU and, more importantly, because other prisoners remain in that unit, an issue with regard to the conditions of confinement in the LTSU is capable of repetition. Therefore, we have chosen to review this matter at this juncture. *See Bronson v. Domovich*, 427 Pa.Super. 312, 628 A.2d 1177 (1993) (although petitioner was no longer in solitary confinement, the court heard his challenge that the condition of confinement was improperly imposed).

¶ 6 When considering appeals in a case where the trial court has denied a petition for a writ of *habeas corpus*, we are guided by the following:

> Our standard of review of a trial court's order denying a petition for writ of *habeas corpus* is limited to abuse of discretion. *See Commonwealth, Dep't of Corrections v. Reese*, 774 A.2d 1255, 1261 (Pa.Super.2001). Thus, we may reverse the court's order where the court has misapplied the law or exercised its discretion in a manner lacking reason. *See Lachat v. Hinchcliffe*, 769 A.2d 481, 487 (Pa.Super.2001) (defining abuse of discretion). As in all matters on appeal, the appellant bears the burden of persuasion to demonstrate his entitlement to the relief he requests. *See Miller v. Miller*, 744 A.2d 778, 788 (Pa.Super.1999).

The availability of *habeas corpus* in Pennsylvania is both prescribed and limited by statute. *See* 42 Pa.C.S. §§ 6502 (Power to issue writ); 6503 (Right to apply for writ). Subject to these provisions, the writ may issue only when no other remedy is available for the condition the petitioner alleges or available remedies are exhausted or ineffectual. *See Reese*, 774 A.2d at 1260. Thus, "*habeas corpus* should not be entertained ... merely to correct prison conditions which can be remedied through an appeal to prison authorities or to an administrative agency." *Commonwealth ex rel. Bryant v. Hendrick*, 444 Pa. 83, 280 A.2d 110, 113 (1971). Moreover, "it is not the function of the courts to superintend the treatment and discipline of prisoners in penal institutions." *Id.* Accordingly, the writ may be used only to extricate a petitioner from illegal confinement or to secure relief from conditions of confinement that constitute cruel and unusual punishment. *See id.*; *Weaver v. Pa. Bd. of Probation and Parole*, 688 A.2d 766, 775 n. 17 (Pa. Cmwlth.1997). "[T]he failure or refusal of prison authorities to exercise discretion in a particular way may not be reviewed in a *habeas corpus* proceeding." *Commonwealth ex rel. Tancemore v. Myers*, 189 Pa.Super. 270, 150 A.2d 180, 182 (1959).

*Commonwealth ex rel. Fortune v. Dragovich*, 792 A.2d 1257, 1259 (Pa.Super.2002), *appeal denied*, 569 Pa. 690, 803 A.2d 732 (2002).

¶ 7 The thrust of Appellants' argument is that the conditions found in the LTSU

are so cruel and inhumane that this Court must grant relief to protect the prisoners' fundamental and basic rights. *See Bryant*, 280 A.2d at 113 (stating that "where the conditions of the confinement are so cruel and callous ... the courts may grant relief through *habeas corpus* in order to protect the petitioner's fundamental and basic rights").

¶ 8 We begin by setting forth the extensive summary of facts from Judge Colville's opinion, written prior to the time that Appellants were transferred to the SMU in Greene County:

Mr. Rivera has been in the [LTSU] since April 7, 2000 and Mr. Torres since April 25, 2000. This unit houses approximately 37 prisoners out of the approximately 37,000 prisoners in the Pennsylvania Department of Corrections system overall, which constitutes less than one-tenth of one percent of the prison population. According to Joel Dickson, Deputy Superintendent for Internal Security for SCI–Pgh, the LTSU is the "last step ... in the process to attempt to get inmates to comply with the rules and regulations of the department." The inmates in this unit are described as the "most problematic" inmates in the system, who generally have an extensive misconduct history, a history of assaultive behaviors against other inmates or employees, pose a significant escape risk and/or constitute a threat to the safety and security of the institution for other reasons.

According to Dickson, the LTSU was started in April, 2000, and a written policy governing the unit was issued June 8, 2000, with an effective date of September 1, 2000. According to this policy, one of the reasons for transfer of a prisoner to the LTSU is a failure to satisfy the requirements of the somewhat less restrictive disciplinary custody

units, the Special Management Unit program (SMU) and/or the Restrictive Housing Unit (RHU). Dickson explained that these units are designed as temporary disciplinary custody arrangements from which the inmate typically would return to the general population upon good behavior and that those inmates in the LTSU have shown a failure to response [sic] to that experience. In Mr. Torres' case, the paperwork indicates that he was transferred to the LTSU upon failure in the SMU. Of the five levels in the SMU at SCI–Greene, in fourteen months Mr. Torres had failed to move out of the most restrictive Level 5. The evidence also indicates that as of the time of his transfer to the LTSU, Mr. Torres had accumulated approximately 126 misconducts. Thirty-eight of these misconducts were for assault and thirty-six were for threats to an employee. Mr. Rivera also had multiple misconducts.

Within the LTSU, there are two levels with a few additional privileges being given to those whose behavior enables them to move up to Level 1. Thus, Level 2, where Mr. Torres and Mr. Rivera reside, is the most restrictive unit in the prison system, with the least privileges. The inmates are not allowed most types of personal property, newspapers, leisure books, radio, television, visits, or participation in educational or religious programs. They are confined in a solitary cell for twenty-three hours a day. Three showers a week are allowed and one hour of exercise a day, five days a week. There are limited law library privileges and it is not open on the weekends.

The inmates in the LTSU, Level [2] have an opportunity to move up to Level 1 "primarily through compliant behavior and cooperation with [the] Unit Management Team, staff, and the custody staff

on the unit . . . ." Although many of the conditions are the same at that level, a few additional privileges such as leisure books or commissary spending are added. In addition to the possibility of moving up this step, according to Deputy Superintendent Dickson, approximately 20% of the inmates in the LTSU have progressed out of the LTSU completely since it began in April 2000.

The LTSU, unlike the RHU, is potentially a stay of indefinite duration for the inmate. Mr. Torres testified that he has been told he may be there indefinitely. Theoretically, an inmate can remain in the LTSU until the day that he is released back into the community at the expiration of the sentence. As an example, at the time of the October 2001 hearings in this matter, Mr. Torres had accumulated disciplinary custody time in excess of several years for multiple misconducts. Although disciplinary custody time can be set aside through good behavior pursuant to the review processes established in the LTSU, a significant accumulation of such time could take a lengthy period of good behavior to overcome.

The correctional officers that are assigned to the LTSU receive the regular basic training of any correctional officer and an additional 3–day RHU training which involves, in part, a focus on the use of force and restraints to deal with this more difficult inmate population. These staff also receive an annual psychological review.

The basic conditions in this most restrictive of units designed for the most severe behavioral problems in the prison population are, perhaps not surprisingly, very unpleasant. There is a regular problem of feces throwing and the accompanying stench, which has been recently only partially corrected by a modification of the cell doors. Another practice of stopping up toilets until they run over and flood the cells, is not uncommon and can lead to similar unsanitary conditions. Although the institution has a specialized team to go in and clean and sanitize after such incidents, the evidence suggests that there are sometimes periods of delay during which the inmates are residing and even eating their meals within the sight and smell of human waste. There was no evidence, however, that inmates['] food itself was contaminated with this waste. Although petitioners allege that the staff actively encourage the throwing of feces, the evidence did not support this allegation.

As noted above, the inmates in the LTSU have 23 hours of solitary confinement in their cells per day with one hour a day in the yard. There is considerable noise described as banging and screaming on the unit at all hours of the day and night and the lights are left on twenty-four hours a day. Many of the inmates are described as suffering from mental and emotional illnesses, although the severely mentally ill are apparently housed in a separate unit. This Court had the opportunity to visit the Psychiatric Unit which is staffed with a full-time nurse, and the inmates appear well managed and orderly. It is not clear to this Court whether the mental and emotional conditions demonstrated in the LTSU contribute or cause the extreme behavioral issues that landed these inmates in the LTSU or whether those types of conditions are in part caused by long periods of solitary confinement in such a unit.

There have been problems with the heat during which the cells have been quite cold during the winter months, although extra blankets appear to have been available at those times. Mr. Torres admitted that they are working on

the heat. At times, pepper spray is used to control unruly inmates, and the spray lingers in the air, causing problems for the surrounding inmates. Mr. Dickson testified that when the spray is used, the ventilation system is turned off to prevent the spray particles from being sucked back into the cell block and causing even greater problems.

There was testimony about the inmates having to choose on occasion between use of the law library or their regular one-hour a day exercise time. Mr. Torres was able to point to two occasions when he had personally been forced to make such a choice. The evidence also established that Mr. Torres had turned down his yard time on numerous occasions between October 2000 and January 2001.

To punish the LTSU inmates for misconducts, they are sometimes put in "alternate housing," which involves being put into a cell without the inmate's property or clothing, with a smock and no underclothing to wear, a mattress and a "security blanket." According to the LTSU policy, where an inmate's misconduct has involved the use of the mattress, such as using it to create a barricade or destroying it for any purpose, this alternate housing would exclude a mattress and require the inmate to sleep on a metal bed frame or on the concrete slab. Mr. Torres was deprived of a mattress on at least one occasion in which it is unclear from the paperwork that he had done anything to the mattress. While in this alternate housing, if the inmate's misconduct has involved misuse of food or utensils (cups or containers have at times been used to collect fluids or feces to use against staff or other inmates), the inmate will be given only a "nutritional food loaf" to eat during the duration of the punishment, which is a frozen concoction of rice and

some sort of starch. This is done only for short durations until the inmate is brought into conformity and the process is done under medical supervision. The water is also controlled from outside the cell during these punishments to avoid the inmate causing a flood, although water to drink is apparently made available every few hours. Mr. Torres testified that on one occasion when in alternate housing, he refused the offered water, but was still able to get water to drink by continually pressing the toilet button on the sink, which caused water to leak out which could be collected. In one instance, Mr. Rivera testified to having been put in a "four-point restraint" for a misconduct, which constituted being chained to a metal bed frame by all four limbs, during which restraint he was unable to use the bathroom and was forced to soil himself with urine and feces. Prison officials noted this was after he attacked a guard and had to be forcefully removed from his cell.

Both petitioners have suffered from depression and other emotional and psychological problems and there is little or no treatment given to them for these problems. A psychiatrist does treat particular inmates and has provided medication to Mr. Torres at times. A counselor is available on the unit once a month, but must share time with all the inmates and there is no privacy for counseling. Mr. Rivera testified that he has talked to her but it hasn't helped him and that a Dr. Culli has seen him twice for medication. There is a system of inmate reviews which includes monthly reviews by the Unit Management Team and quarterly reviews by a Program Review Committee. These reviews, in addition to the established grievance procedures, provide opportunities for the inmates to discuss prob-

lems and grievances that they might have with the conditions of their confinement as well as to have their behavioral status reviewed and possibly some of their disciplinary custody time set aside.

Mr. Rivera has suffered from a medical condition and has complained that he has not received proper medical treatment and tests. The facts with respect to this claim establish that Mr. Rivera was seen by one physician and that another physician reviewed his records. That Mr. Rivera was not in agreement with these physicians regarding the treatment or tests prescribed does not make the medical treatment inadequate and certainly does not rise to cruel and unusual punishment.

In addition to the complaints about the basic conditions of life in the LTSU, Petitioners set forth evidence regarding what is possibly their central claim— that they are unfairly and harshly punished and retaliated against by the prison staff for making legitimate complaints or for filing grievances through the proper channels with respect to the conditions on the unit. A large percentage of the testimony during this two-day hearing related to Mr. Torres' and Mr. Rivera's having been beaten and thrown into "alternate housing" or other restraints without having done anything to merit this punishment, which they argue constitutes physical and psychological abuse.

Mr. Torres testified about one incident in which he was apparently thrown down and kicked continually by a correctional officer for no apparent reason and Mr. Rivera describes an incident in which he was beaten up by one officer in his cell while another stood by and watched. There was considerable additional testimony with respect to incidents of this nature. Generally, the evidence demonstrated that for each of these incidents, the correctional facility has documented misconducts on the part of Petitioners, which were the stated cause of the additional restraint and loss of privileges. The evidence of excessive force came down to a "he said, she said" variety.

T.C.O. at 2–9 (citations to the record omitted). Based upon these findings, the trial court concluded that Appellants failed to sustain their burden that constitutional violations occurred. The court concluded that:

The unit in which the [Appellants] reside is an exceptional unit reserved for those prisoners who have significantly deviated from the requirements of life in the prison and whose behavior has continually posed a significant problem. Both [Appellants] here admittedly received significant numbers of misconducts before coming to the unit. This Court would expect the conditions on such a unit to be even less pleasant than the rest of the prison, and that few privileges, comforts or amenities will be available, as the LTSU is disciplinary custody and is intended to be punitive. Other behavior modification approaches have failed before the inmates reach this point.

Based on the evidence reviewed, the basic requirements of life are met in this unit, including food, clothing, shelter, medical attention, and basic hygiene. Exercise and use of the law library, although perhaps not available to the extent [Appellants] and this Court might like, are made available. Many of the conditions, such as the noise level and the feces throwing, are to some extent out of the control of the prison officials, but to the extent that they are not, actions are taken, such as the door modifications, to improve those situations. The heat doesn't work very well, but the prison has taken steps to bring it up to

standard. Blankets are made available when it is cold. Even in "alternate housing," the conditions, although constituting rather harsh punishment, are not cruel and unusual. These conditions do attract some attention, because sleeping on a metal frame or the cold hard floor and eating a dry "loaf" are fairly extreme measures. The four-point restraint described by Mr. Rivera is particularly harsh, and yet the duration of such a punishment is fairly short. To the extent these punishments are meted out to restrain out-of-control inmates and that they are of relatively short duration, they are not cruel and unusual.

With respect to the issue of the guards' behavior and whether or not punishments are meted out unfairly or in retaliation for legitimate claims or grievances being filed, is simply not something this Court is prepared to find. These arguments are properly dealt with within the grievance process or by way of administrative remedy and appeal, and not before this Court on a writ of *habeas corpus*. The evidence was insufficient to convince this Court that the misconducts accumulated by [Appellants] were other than legitimate, or that the punishments for those misconducts were outside of the discretion by the prison to maintain security and control.

T.C.O. at 11–13. Accordingly, the trial court denied Appellants' petitions for writ of *habeas corpus*.[2]

¶ 9 This Court in *Johnson v. Desmond*, 441 Pa.Super. 632, 658 A.2d 375 (1995), discussed the Eighth Amendment's protection against cruel and unusual punishment, quoting extensively from the Pennsylvania Supreme Court's *Bryant* opinion. The *Johnson* court stated that:

Just what constitutes cruel and unusual punishment in the constitutional sense is a matter which defies concrete definition. However, it has long been understood that the concept of cruel and unusual punishment is one of wide application, capable of acquiring new depth of meaning to conform to more enlightened concepts of criminal justice.

. . . .

The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. . . .

*Johnson*, 658 A.2d at 377 (quoting *Bryant*, 280 A.2d at 116). This Court in *Johnson* further stated that "[n]ot every wrong rises to the level of a constitutional violation." *Id.* The *Johnson* opinion discussed a number of federal cases wherein prisoners had alleged Eighth Amendment violations. A review of these cases reveals that a violation of a prisoner's Eighth Amendment rights must involve the unnecessary and wanton infliction of pain, whether it is

---

2. Additionally, the trial court commented that it had concerns with the way in which the LTSU was managed in that it "may not be serving the best interests of the inmates, the staff or the community at large." T.C.O. at 13. The court concluded by stating that:

Recognizing that [the court] lacks an understanding of the financial and practical aspects of running a prison and that these comments are entirely outside of this Court's power or authority to impose or enforce, it is hoped that SCI Pittsburgh

would consider the goals and purpose of its Long Term Segregation Unit and re-evaluate the unit's effectiveness at meeting those goals. Within the context of a unit designed to house incorrigible-type inmates, perhaps there is a place for some more employee skills-training, some counseling or assistance for these inmates who seem clearly to need some help in adjusting and in preparing to re-adjust to a regular unit or to the outside world.

*Id.* at 15.

physical or emotional. Moreover, as Appellants note in their brief, "[p]rison officials must provide humane conditions of confinement: prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Appellants' brief at 16 (citing *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

¶ 10 We note, as did the trial court, that the conditions complained of here, when compared to the conditions described in *Bryant,* do not show that they "either alone or in combination with other conditions, deprived [Appellants] of 'the minimal civilized measure of life's necessities,' or at least a 'single, identifiable human need.'" T.C.O. at 11 (quoting *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Moreover, with reliance on *Farmer,* the trial court concluded that Appellants failed to establish deliberate indifference to the conditions by the prison officials. *Id.*

¶ 11 Following our thorough review of the record, the briefs, and the trial court's opinion, and with the guidance of case law, we are compelled to agree with the trial court that Appellants failed to carry their burden of proving that their conditions of confinement in the LTSU were cruel and unusual so as to require the grant of their petitions for writs of *habeas corpus.* We conclude that, in conformity with our standard of review as outlined in *Dragovich,* the trial court did not misapply the law, nor did it exercise its discretion in a manner lacking reason. Accordingly, we affirm the denial of the petitions for writs of *habeas corpus.*

¶ 12 Orders affirmed.