# Sheehan v. Sheehan

C.P. of Fulton County, no. 20 of 1999-C.

*Timothy W. Misner,* for plaintiff.
*Anne S. Johnson* and *Thomas J. Trgovac,* for defendant.

WALSH, *J.,* December 19, 2001—

## PROCEDURAL HISTORY

In 1999, Donald C. Sheehan, plaintiff, brought an action against Lizabeth A. Sheehan, defendant, for the partition of marital real estate. The defendant filed an answer, and at the request of the parties the court convened a pretrial conference on September 28, 1999. The court then directed that the matter be referred to James M. Schall, Esq. as master. The appointed master conducted two days of hearings and then presented his report and proposed decree. Thereafter, both parties filed exceptions to the master's report, and the instant case is now before this court for a disposition of the disputed exceptions.

## FACTUAL HISTORY

The defendant and the plaintiff were married on June 15, 1974. Their marriage produced one child, Kathleen Sheehan, who was born on June 26, 1979. In 1981 the parties separated and after that date never again lived together. In 1988, the parties were divorced by a final judgment and decree in the Superior Court of Dougherty County, Georgia.

Prior to the divorce, in 1979, the defendant's parents, William N. Wooldridge and Frances C. Wooldridge, transferred 15.6 acres to both the defendant and plaintiff. The transferred land is the real estate which is the subject of this partition action. At the time of the conveyance, the real estate was unimproved. The plaintiff and defendant, with the assistance of the defendant's brother, Robert Wooldridge, began construction of a house on the property on or about April 30, 1979. At the time the parties separated, one wing of the residence was under roof and only partially completed, thus making the house uninhabitable. After 1981, the plaintiff made no financial contribution to the cost of construction of the house. Following the parties' separation that year, the plaintiff, along with Robert Wooldridge and his construction crew, continued to build the residence on the property. After early 1982, plaintiff performed no substantial work on the construction of the residence. After plaintiff stopped performing work, construction came to a virtual stop, and the house continued to be uninhabitable. Later, at the request of the defendant, in 1984 construction began once again on the house. The funds for the continuing construction of the residence came from the defendant's wages, the defendant's retirement funds, loans from the defendant's brother (Robert Wooldridge), and gifts from the defendant's parents.

On July 3, 1986, the parties sought and obtained a $48,000 mortgage on the subject property. However, these funds were used neither to improve the subject property nor to continue construction on the home. Between 1993-2000, defendant paid homeowners' insurance pre-

miums for coverage on the subject property, while the plaintiff made no payments.

The subject property became habitable in late spring of 1985, yet the property was still only partially completed. The defendant and the parties' minor daughter, Kathleen, have lived in the subject house from 1985 until the present. During this time, the defendant made extensive necessary expenditures toward construction and preservation of the house, including labor costs, mortgage payments, homeowner's insurance premiums, real estate taxes, repairs and maintenance, and school and county taxes. The defendant's improvements and necessary expenditures, between the 1988 divorce and the present, have caused the value of the property to increase by $150,000.

The December 9, 1988, divorce decree stated that the plaintiff was to pay $500 monthly mortgage payments instead of child support. The defendant initiated a child support action against the plaintiff when, after the mortgage was paid off in July 1996, the plaintiff ceased paying child support. The plaintiff contends that the mortgage payments were not a form of child support.

## EXCEPTIONS

The plaintiff has filed the following exceptions to the master's report:

(1) For various reasons, the master erred in his finding of facts nos. 7, 8, 10, 13, and 21. (Plaintiff identifies these as his first five exceptions.)

(2) The master erred in his recommendation regarding the disposition of the real estate.

(3) The master's proposed decree nisi is improper because it gives the property to the defendant and violates the law and Rules of Civil Procedure.

In addition, the defendant filed the following exceptions to the master's report:

(1) The master erred in deciding that the defendant's claim for credits in her counterclaim was not a recoupment.

(2) The master incorrectly found that plaintiff's $500 monthly payments to defendant, between December 1986 and July 1996, were mortgage payments rather than child support payments and that defendant was not entitled to a credit for one-half of the total mortgage payments.

(3) The master erred in sustaining plaintiff's objection to defense exhibit 57.

(4) The master erred in sustaining plaintiff's objection to defense exhibit 60.

(5) The master erred in denying defendant's claim for a credit as an advancement from her mother's estate.

## DISCUSSION

In reviewing a master's report, we note that the report is but a recommendation. It is the responsibility of the court to review the master's report and determine whether the recommendations are appropriate. *Tagnani v. Tagnani,* 439 Pa. Super. 596, 654 A.2d 1136 (1995). The court has the authority to accept the master's finding of facts so long as the facts are supported by the record. More specifically, since the master had the opportunity to observe the witnesses' demeanor, great weight is given to the

master's assessment of witness credibility. See *Brojack v. Brojack*, 385 Pa. Super. 502, 504, 561 A.2d 788, 789 (1989).

### *Plaintiff's Exceptions*

The court will first consider the plaintiff's exceptions to the master's report, beginning with the contentions that several findings of facts are not supported by the evidence.

1. The Master's Finding of Fact No. 7[1] Is Not Supported By the Evidence. To the Contrary, the Testimony of the Witnesses Indicated That Payments for the Construction Materials Were Made Through at Least September 1983.

The plaintiff contends that fact no. 7 is contrary to the evidence provided. While the plaintiff argues that he paid for a roof in 1983 by reference to a "comment in the checkbook"[2] he did not provide physical evidence of this comment. In contrast, the defendant testified that she paid the plaintiff back in full.[3] In addition, although the defendant admitted that it was possible that the plaintiff paid supplier and contractors directly for work on the

---

1. The master found that "after the parties separated in 1981 plaintiff made no financial contribution to the cost of construction of the residence."

2. The plaintiff stated, "I have a comment here in my checkbook I paid for that roof in September of 1983." (N.T. 61—day 2.)

3. When asked about the above testimony by the plaintiff, the defendant responded, "I paid him back and I have a receipt signed that it was paid in full." (N.T. 70—day 2.)

subject house during 1981 to 1988,[4] the plaintiff did not produce any evidence to support his statements of financial contribution at the hearing. Since no physical evidence was introduced to support the claim or defense and the master had the opportunity to assess the witnesses' demeanor, it is proper to defer to the master on witness credibility.

Accordingly, plaintiff's exception to fact no. 7 is overruled.

## 2. The Master's Finding of Fact No. 8[5] Is Not Supported By the Evidence. To the Contrary, the Plaintiff Performed Work Until 1985.

Next, the plaintiff claims that fact no. 8 lacks support in the record. The plaintiff has directed the court's attention to the transcripts, arguing that the defendant admits the plaintiff was at the house between 1981-1988. In fact, the transcripts show that the defendant never, in fact, stated that the plaintiff was actually "at the house" until 1988.[6] Also, the defendant has made cogent arguments that though the plaintiff did perform and supervise work on the house between 1979 and 1982, he did not per-

---

4. When asked if the defendant knew if the plaintiff paid the contractors, the defendant responded, "Since he was there doing that [work] he very well could have. But once again, I'd like to see them [receipts] which I am sure you have." (N.T. 109—day 1.)

5. The master found that, "After early 1982, plaintiff performed no substantial work on the construction of the residence."

6. When asked "But there are photos of him doing work on this house periodically to that time period?" The defendant responded, "Periodically." (N.T. 109—day 1.)

form "substantial" work on the house.[7] The master had the opportunity to hear all of the evidence, to gauge and consider the testimony as a whole and to assess the credibility of the witnesses. Moreover, even the plaintiff has directed us to no evidence that the plaintiff's involvement in the continuing construction of the parties' home was anything more than incidental after about 1983. Once again, given the equivocal evidence and the need to rely largely on the credibility of the witnesses providing it, the court will defer to the master on the credibility issue.

Therefore, plaintiff's exception to fact no. 8 is overruled.

### 3. The Master's Finding of Fact No. 10[8] Is Incomplete. Funds for the Construction Were Also Secured By Plaintiff Obtaining a Home Improvement Loan From the Navy Federal Credit Union.

In finding of fact no. 10, the plaintiff states that the master failed to consider the testimony provided by both parties, that the plaintiff obtained funds from the Navy Federal Credit Union.[9] It is not disputed that the plaintiff

---

7. After being asked if the plaintiff helped put shale in the driveway, in June 1985, the plaintiff responded "I made sure it was spread properly."(N.T.—day 2.)

8. The master found that, "The funds for the continuing construction of the residence came from defendant's wages, from withdrawal of her retirement funds from the Washington County Board of Education, from loans from her brother, Robert Wooldridge, and gifts from defendant's parents."

9. During the defendant's cross-examination, the following testimony occurred:

"Q: Didn't he also use the money from the Navy Federal Credit Union to buy supplies and materials to build the house?

did obtain a loan from the Navy Federal Credit Union. The dispute concerns the use of the loan proceeds. The court finds that the testimony concerning the use of the money from the loan is equivocal at best. When asked if the plaintiff's money was used to buy supplies and materials to build the house, the defendant responded, "I'm sure he would say that."[10] The statement made by the defendant is too ambiguous and can- not be construed as an admission concerning the use of the money. Since there is contradiction in the testimony. and because the master had the opportunity to observe the witness, it is the master who is the best judge of credibility. See *Brojack v. Brojack,* 385 Pa. Super. 502, 504, 561 A.2d 788, 789 (1989).

Therefore, the court should "give weight to the determination of credibility by the master who saw the parties, heard their testimony and observed their individual demeanor." *Herwig v. Herwig,* 279 Pa. Super 65, 70, 420 A.2d 746, 748 (1980). Given all of this, there is sufficient basis for the master's finding of fact no. 10.

The plaintiff's exception is overruled.

---

"A: Prior to permanent separation.

"Q: Yes, that's what I'm asking.

"A: I'm sure he would say that." (N.T. 101—day 1.)

Then, during the plaintiff's direct examination, the plaintiff's attorney asked:

"Q: Now, there was talk about a Navy Credit Union payment made from a mortgage that you had at Home Federal. Do you recall that testimony? There was a check introduced, a payment to Navy Federal Credit Union?

"A: Yes." (N.T. 63—day 2.)

10. See defendant's cross examination from footnote 9.

## 4. The Master's Finding of Fact No. 13[11] Is Misleading in That Part of the Funds From the Mortgage Was Used To Repay the Home Improvement Loan Plaintiff Had With the Navy Federal Credit Union.

Both the plaintiff and defendant allow for very little argument concerning this exception. It appears as though this exception is merely an extension of the exception discussed above in "finding of fact no. 10." As the record reflects, the money obtained from Home Federal Savings and Loan mortgage was used to pay off a personal loan taken by the plaintiff from the Navy Federal Credit Union and to repay a loan from the defendant's mother.[12]

---

11. The master found that "None of the funds received from the mortgage were used to improve the subject property."

12. On day 1, the direct examination of the defendant by her counsel shows the following:

"Q: I'm showing you defense exhibit no. 10. Is that a canceled check made payable to the Navy Federal Credit Union?

"A: Yes, it is my canceled check out of my account made to Navy Federal Credit Union.

"Q: In the amount of what?

"A: $26,633.63.

"Q: To your knowledge what was that payment for?

"A: That was to pay back a loan that Don had gotten from Navy Federal Credit Union.

"Q: Was that a joint loan?

"A: No ma'am.

"Q: Was it a personal loan, a personal loan of Mr. Sheehan's?

"A: It was from his bank.

"Q: Had you signed the note for that loan?

"A: Not that I recall, no.

"Q: I'm showing you defense exhibit no. 11, another canceled check. Who is that payable to?

"A: This is made payable to my mother, Frances C. Wooldridge in the amount of $21, 853.29." (N.T. 50—day 1.)

Since the master found that funding for the continued construction of the house came from the defendant's funds, combined with the testimony that the money from the mortgage went to repay personal loans, the master was correct in the finding of fact no. 13. The court finds that the money from the mortgage was not used to improve the subject property.

As a result, the plaintiff's exception is overruled.

## 5. The Master's Finding of Fact No. 21[13] Cannot Support the Master's Recommendations Because the Statements Were Made During the Parties' Divorce Process and Were Offers of Compromise Which Were Never Accepted.

The plaintiff's counsel contends that the oral and written statement which plaintiff made to the defendant (*i.e.,* that she could remain in the house for as long as she wanted) is part of a settlement agreement. Counsel then argues that since no agreement was ever reached, the previous statements are inadmissable under Pa.R.E. 408. Defense counsel claims, on the other hand, that the plaintiff's later written statement of reassurance (defense exhibit 56) was not a part of the settlement, but was in fact a reiteration of prior assurances plaintiff had made to defendant and was contained as a separate document in a particular mailing. The defendant's counsel advances a compelling argument in pointing out that the plaintiff had no real interest in a property settlement at the time

---

13. The master found that "plaintiff told defendant verbally (day 1, Tr. p. 46, ll. 12-24) and in writing (defendant's exhibit no. 56) that she 'can remain there as long as you want.'"

of divorce because of his statement that "I wanted my daughter to grow up in the best environment that I could provide for her."[14] The plaintiff did not seek a property settlement until eight years after the divorce by which time (1) the defendant had made substantial financial contributions to the subject property; (2) the mortgage was paid off; (3) the value of the property had increased by $150,000; and (4) the parties' minor daughter had been living with her mother and attending the local high school for several years. The defense has convincingly argued, and the master very well could have taken into consideration, the major contributions the defendant put into the house before the plaintiff suddenly decided to take an active interest in the property.

This exception of the plaintiff is overruled. Beyond the finding of facts, the plaintiff excepts to the following:

## 6. Disposition of Real Estate[15]

The plaintiff argues that the master did not have the equitable power to dispose of the property other than

---

14. N.T. 65—day 2.

15. The plaintiff's exception no. 6 is set forth in full in this note. The master's recommendation regarding the disposition of the real estate is improper for the following reasons:

"(A) Since the master found that the plaintiff was entitled to one-half of the real estate, defendant has no right to object to a private sale. Pa.R.C.P. 1563.

"(B) The disposition of the real estate recommended by the master is not allowed under the Rules of Civil Procedure or by law.

"(C) The master erred in not ordering a private sale of the real estate pursuant to Pa.R.C.P. 1563.

through a private sale. According to the plaintiff, Pa.R.C.P. 1563 requires that if property is not capable of division, then the property should be offered to the parties through a private sale. In addition, the plaintiff's counsel correctly asserts that the master inappropriately relied on the doctrine of equitable estoppel. Since the estoppel theory was not pled as a new matter, Pa.R.C.P. 1030, and affirmatively asserted in the answer, plaintiff claims that the estoppel theory was waived by the defendant. Pa.R.C.P. 1032.

Yet the theory of equitable estoppel is not a necessary element in the present case. Pursuant to Pa.R.C.P. 1551, "The procedure in an action for the partition of real estate shall be in accordance with the rules relating to the action in equity." The court agrees that a court of equity has the power to afford relief despite the existence of a legal remedy when, from the nature and complications of a given case, justice can best be reached by means of equity's flexible machinery. *Schrader v. Heath,* 408 Pa. 79, 83, 182 A.2d 696, 698 (1962). The master correctly

"(D) The master erred by not giving plaintiff an opportunity to take the real estate.

"(E) The master erred in not treating the parties equally.

"(F) The master erred in considering estoppel because:

"(i) Such defense was not pled as new matter by the defendant.

"(ii) The written and oral statements relied on by the master regarding the real estate were made as offers of compromise in the context of an overall marital property settlement between the parties which was never accepted by the defendant.

"(iii) Defendant was aware of the legal ramifications of the divorce and its effect on her rights in respect to the real estate (N.T. 106 and 107, day 1); and

"(iv) The doctrine cannot be predicated on errors of judgment by the person seeking its benefit."

relied on his equitable powers in allowing the defendant to retain possession of the subject residence and not expose the property to a private sale. As noted by the court in *Zeigler v. Zeigler,* 22 D.&C.3d 225, 228 (1982), a court should "look to the record and the master's discussion to determine if his recommendation was based upon fair and equitable principles."

This is an equity action, and therefore the equity jurisdiction continues until all the matters have been resolved. *McGovern v. Spear,* 463 Pa. 269, 272-73, 344 A.2d 826, 828 (1975); *Arcadia Theatre Co. v. Sablosky,* 418 Pa. 34, 49, 209 A.2d 375, 382 (1964). Since this court has such equitable powers, we also rely on the equitable principle that "although a chancellor's powers are controlled by law in Pennsylvania, a chancellor still possesses the broad and flexible ability to grant remedial relief where justice and good conscience so require." 14 Standard Pa. 2d §79:1 (1996).

Strict application of Pa.R.C.P. 1563 in this case is manifestly unjust because the plaintiff and defendant are not equal with regard to the money and the time invested in the subject property. The defendant repeatedly relied on the plaintiff's statements that the property would be hers, and as a result, invested large sums of money and much of her time in the building, financing, insuring, maintaining, repairing and improving of the subject property. In the instant case, the real estate itself was a gift from the defendant's mother; the defendant expended extensive financial resources towards constructing and preserving the house; the plaintiff told the defendant that she could remain in the house as long as she desired; the plaintiff contributed little in the way of financial re-

sources, in comparison to the defendant, and did no substantial work to improve the subject house after 1982; and the defendant has occupied the house to the exclusion of the plaintiff since 1986.

Had the master found that the parties were bound by Pa.R.C.P. 1563 which requires a private sale, the plaintiff would stand to derive some six figures of "equity" at the expense of the defendant from a property in which he acquired a joint interest more than 20 years earlier and which had been improved from a field to a beautiful home, though his contributions into that "improvement" absolutely paled in comparison to the efforts of the defendant. Beyond some minimal, early contributions of finance and manpower, the plaintiff's only legitimate claim to the subject property was his legal claim—that his name is on the deed. The equitable claim to the property, however, lay almost entirely with the defendant, particularly in view of plaintiff's continuing assurances to the defendant for a decade and a half that "the property would be hers." Requiring a private sale, as the rules suggest, would have the defendant paying dearly for the right to hang onto this greatly improved property in which she—and for the most part, she alone—has invested her blood, sweat and tears for more than two decades; and it would result in a financial windfall to the plaintiff. It is beyond question that the legal remedy, under these facts, is not adequate; neither could a court of equity countenance such an unfair outcome.

Following the Pennsylvania Supreme Court's opinion, a court with equity jurisdiction shall "afford relief if the statutory or legal remedy is inadequate, *or if equitable relief is necessary to prevent irreparable harm." Martino*

*v. Transport Workers' Union of Philadelphia. Local 234,* 505 Pa. 391, 396, 480 A.2d 242, 244-45 (1984). (emphasis added) Because the court finds that the master correctly balanced the rules governing equity actions—which would have dictated a far more harsh result—against equity principles given the factual backdrop of this case, the plaintiff's exception is overruled.

### 7. The Master's Proposed Decree Nisi Is Improper in That it Awards the Property to Defendant in Violation of Law and the Rules of Civil Procedure As More Fully Set Forth in Exception 6 Which Is Incorporated Herein By Reference.

After reviewing plaintiff's last exception concerning the master's proposed decree nisi, it appears that this is not a separate exception to the above "disposition of property." The court sufficiently addressed this exception in item 6 above.

### *Defendant's Exceptions*

The court next considers the defendant's exceptions to the master's report.

### 1. The Master Erred in Finding That Defendant's Comprehensive Claim for Credits Identified In Her Counterclaim Was Not a Recoupment.

Recoupment is a common-law remedy where a defendant can reduce the amount of the plaintiff's award if the defendant has a counterclaim that arises out of the same litigation commenced by the plaintiff. *Stulz v. Boswell,* 307 Pa. Super. 515, 453 A.2d 1006 (1982). If a counter-

claim is in fact a recoupment, the statute of limitations will not bar the defendant's claim. *Household Consumer Discount Co. v. Vespaziani,* 490 Pa. 209, 415 A.2d 689 (1980). Plaintiff contends that recoupment normally presents itself only in contract cases. Yet, no cases identified by the plaintiff limit recoupment to contract cases or even mention the fact that recoupment is normally associated with contract cases. See for example, *Household Consumer Discount Co. v. Vespaziani, supra* and *Stulz v. Boswell, supra.* Neither have we found any such authority.

The plaintiff argues that the defendant in this case is asserting an affirmative defense and therefore is advancing a setoff, rather than a claim for recoupment. Yet, in the instant case, the defendant seeks only to recover her losses for necessary expenditures on the property which is the subject of this partition action commenced by the plaintiff. In addition, though both the master and the plaintiff quote *Bednar v. Bednar,* 455 Pa. Super. 487, 688 A.2d 1200 (1997), as applying to the case at issue, in *Bednar* the counterclaim is a setoff. The counterclaim is characterized as a setoff rather than a recoupment because the appellants' counterclaims sought affirmative relief in the form of a money judgment against the appellee. *Id.* That is not the case here.

The plaintiff argues that in order to credit the defendant for taxes paid, the tax contribution has to be compulsory. *Lohr's Estate,* 132 Pa. Super. 125, 200 A. 135 (1938). The plaintiff further argues that the defendant, as a tenant in common, was under no obligation to pay the plaintiff's share of the taxes. Plaintiff's arguments in this regard are entirely unpersuasive. In the present case,

the defendant is in possession of the house. In fact, it is her home and her "castle." The defendant did not pay taxes as a volunteer, but to avoid a tax sale *of her home.* The court agrees with the defendant that to disallow recoupment through credits would ignore the defendant's extensive financial contributions to the subject property.

Therefore, the following items are considered valid claims under the recoupment theory: (a) credit for all costs of building, maintenance and upkeep from the date of separation in 1981 through the present; (b) credit for any and all school and county taxes paid upon the subject real estate by the defendant from 1981 through the present; (c) credit for all principal and interest payments she has made on the mortgage encumbering the subject real estate; (d) credit for labor performed by the defendant and her brother for construction and improvements to the dwelling located on the subject real estate; and (e) credit of $23,500 for the advancement against her inheritance for the original transfer of the land.

Therefore, the defendant's exception is sustained.

2. The Master Erred in Finding That Plaintiff's $500 Monthly Payments To Defendant, Between December 1986 and July 1996, Were Mortgage Payments Rather Than Child Support Payments and That Defendant Was Not Entitled To a Credit for One-Half of the Total Mortgage Payments. In Denying Defendant's Claim for Credit, the Master Entered a Finding That Is Contrary To the Law and the Agreement That Existed Between the Parties.

The defendant disagrees with the master's finding that between 1986 and 1996, plaintiff's monthly payments

to the defendant were mortgage payments rather than child support payments and that defendant was not entitled to a credit for half of the total mortgage payments.

The law in Georgia is well settled that neither a parent nor a court can waive a parent's obligation to pay child support in a divorce decree or any other way. *Department of Human Resources v. Hedgepath*, 420 S.E.2d 638 (Ga. Ct. App. 1992). The parties obtained their divorce in Georgia, and without any evidence to the contrary, this court affords full faith and credit that the Georgia court followed Georgia law in entering a valid divorce decree with a provision that would allow the minor child to obtain support. Pennsylvania's Domestic Relations Law governing a parent's child support obligation is similar to that in the Georgia Domestic Relations Code. Pursuant to 23 Pa.C.S. §4321(2), neither the non-custodial parent nor the custodial parent can be excused from supporting their children. See also, *Mackalica v. Mackalica*, 716 A.2d 653, 656 (Pa. Super. 1998). It appears that both the courts in Georgia and Pennsylvania are obligated to ensure that parents do not waive a child's right to support from the non-custodial parent.

The plaintiff contends that even though the provision which "waived" the child support in the Georgia divorce decree is void, it does not automatically make the mortgage payments child support payments. If these were the only facts, the court would agree; but there are other factors to be considered. First, between 1981-1986 the plaintiff voluntarily paid monthly child support in amounts varying between $250 and $500. Also, the court notes the tax advantage that the plaintiff gets in claiming mortgage interest payments as deductions in his tax returns

in contrast to no deductions for child support. Further, it is apparent that the plaintiff understood that the mortgage payments were made as a substitution for child support because of the plaintiff's December 14, 1988, handwritten letter to the defendant stating, "You agreed since you were getting to claim Kathleen as a dependant you had no objection to my paying $500 on the mortgage in lieu of the child support." (Defense exhibit 57). Finally, the divorce decree itself strongly suggests that it was prepared by a lawyer rather than the Georgia court, permitting the inference that the drafter of the plaintiff's Georgia divorce decree was the plaintiff's attorney. It is apparent to the court that the plaintiff knew that the payments were for child support. Under the circumstances, the decree was crafted to allow the plaintiff to obtain a tax advantage while paying child support.

For the above reasons, the defendant's exception is sustained.

### 3. The Master Erred in Sustaining Plaintiff's Objection to Defense Exhibit 57.[16]

The defendant argues that the master erred in sustaining plaintiff's objection to defense exhibit 57 on the grounds that the post-divorce note was a settlement offer. See Pa.R.E. 408.[17] In addition, evidence offered for a specific purpose, objectionable for other reasons, is

_____

16. Defense exhibit 57 was a letter concerning the purpose of the $500 monthly payments written by the plaintiff's attorney at the time, which had a hand written note on it from the plaintiff.

17. *Rule 408. Compromise and Offers to Compromise.*

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which

admissible for the purpose for which it was offered. Pa.R.E. 105.[18] Plaintiff incorrectly asserts that the only purpose for the admission of exhibit 57 was to collaterally attack the Georgia divorce decree. This is simply not true. The court agrees with the defendant that the evidence was submitted to the master for the purpose of demonstrating that the plaintiff knew the purpose of the monthly $500 payment. As a result, nothing in the Rules of Evidence proscribes the admissibility of defense exhibit 57; and it properly should have been admitted for the purpose for which it was offered.

The defendant's exception is sustained.

## 4. The Master Erred in Sustaining Plaintiff's Objection To Defense Exhibit 60.[19]

The defendant argues that the defense exhibit 60 was neither a settlement offer nor a collateral attack on the

was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

18. *Rule 105. Limited Admissibility.*

"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request shall, or on its own initiative may, restrict the evidence to its proper scope and instruct the jury accordingly."

19. Defense exhibit 60 is a letter dated February 11, 1997, from plaintiff's former attorney to previous counsel for the defendant.

divorce decree. The court agrees with the defendant that exhibit 60 was not offered into evidence to collaterally attack the Georgia divorce decree. Instead, the letter's purpose was to demonstrate the plaintiff paid the mortgage in lieu of child support. Also, while the plaintiff argues that exhibit 60 was aimed at resolving the property matter and child support issue, there is neither mention of negotiating nor an offer to compromise in the letter. See Pa.R.E. 408, *supra* at footnote 16. The letter merely suggests that the parties simply hold in abeyance for 60 days any and all legal action so negotiations could commence. Moreover, even if this letter were a settlement offer, the rule does not require exclusion of evidence if it is offered for a purpose other than showing offers to compromise. Pa.R.E. 408. Here, the letter is tantamount to an admission that "past child support was paid in the form of mortgage payments." Therefore, the defendant's exception is sustained.

### 5. The Master Erred In Denying Defendant's Claim for a Credit in the Form of An Advancement From Her Mother's Estate.

One obtains an advancement when a gift is made to a future beneficiary prior to the benefactor's death, and the gift is in lieu of a share of the estate. *Morris Estate,* 356 Pa. 497, 52 A.2d 172 (1947). In the present case, the defendant's mother signed two documents on January 16, 1979. First, the defendant's mother, as grantor, conveyed the subject property over to the plaintiff and defendant by the delivery of a deed and in consideration of $1.[20] Second, the defendant's mother, as testator, executed

---

20. The deed dated January 16, 1979, states, "that in consideration of $1 and other good and valuable consideration in hand paid, the

a codicil to her will, in which she stated that the property was intended to be a lifetime gift whose value would later be treated as advancement at the time of Frances Wooldridge's death.[21] Later on, the codicil was incorporated into a trust, the provisions of which triggered at Frances Wooldridge's death in 1999.[22]

As in any case, the court must look to the intention of the defendant's mother at the time the instruments were executed. It is probative of the testator's intention that Mrs. Wooldridge executed the codicil to her will and the deed of conveyance on the very same day. The plaintiff argues that the plain meaning of the words should control, because the deed was transferred to both the plaintiff and defendant in consideration of $1 and contains no

receipt whereof is hereby acknowledged, the said grantors [William and Frances Wooldridge] do hereby grant and convey to the said grantees [Donald and Lizabeth Sheehan], All that certain tract or parcel of real estate." Plaintiff's exhibit 2.

21. The relevant part of Frances C. Wooldridge's codicil states:

"I have on January 16, 1979, made a lifetime gift to my daughter, Lizabeth A. Sheehan, of a portion of my real estate being 15.60 acres, and it is my direction that in the administration of my estate this gift be treated by my executor as an advancement so that the residual share passing to my daughter, the said Lizabeth A. Sheehan, shall be decreased by the value attributable to the real estate as of this date, to wit: $23,500." Defendant's exhibit 1.

22. The trust agreement executed on October 3, 1986, between Frances Wooldridge and The Old National Bank of Martinsburg, establishes:

"The settlor acknowledges that she has on January 16, 1979, made a lifetime gift to Lizabeth A. Sheehan of a portion of real estate, being 15.60 acres, and it is the direction of the settlor that in the distribution from this trust that this gift be treated by the trustee as an advancement to Lizabeth A. Sheehan such that her residual share shall be decreased by the value attributable to the real estate as of the date of gift, to wit: $23,500." Defendant's exhibit 55.

restrictions or conditions. *Teacher v. Kijurina,* 365 Pa. 480, 76 A.2d 197 (1950). Yet, it is very clear through the legal actions taken the same day as the deed, that Mrs. Wooldridge intended the transfer of land would be an advancement.

For the reasons stated above, the defendant's exception is sustained.

## ORDER

December 19, 2001, after hearing arguments and considering the exhibits, the master's report, the parties' briefs and the law, it is hereby ordered that:

(1) The plaintiff's five exceptions to the master's finding of facts 7, 8, 10, 13, and 21 are *overruled.* These findings of facts are supported by evidence, and are *confirmed.*

(2) Plaintiff's exceptions 6 and 7 are *overruled.* The master had the equitable power to balance the equities, to conclude that the legal remedy was inadequate and to permit the property to be disposed of other than through a private sale; and the master's finding in this regard is *approved.*

(3) The defendant's exception 1 is *sustained,* and the defendant's claims for recoupment are *approved* such that the defendant may recoup the following as credits in her counterclaim:

(a) all costs of building, maintenance and upkeep from the date of separation in 1981 through the present;

(b) any and all school and county taxes paid upon the subject real estate by the defendant from 1981 through the present dates; and

(c) all principal and interest payments made on the mortgage on the subject of real estate; and

(d) the cost and/or value of labor performed by the defendant and her brother for construction and improvements to the dwelling located on the subject real estate.

(4) Defendant's exception 2 is *sustained*. The master erred in finding that plaintiff's $500 monthly payments to defendant, between December 1986 and July 1996, were mortgage payments rather than child support payments; and the master's finding in this regard is *reversed*. Properly admitted evidence establishes that the payments were for child support; and the defendant should have been credited for one-half of the total mortgage payments.

(5) The master erred in sustaining plaintiff's objections to the admissibility of defense exhibits 57 and 60 and the master's evidentiary rulings are *reversed* such that defense exhibits 57 and 60 are admitted. Therefore, defendant's exceptions 3 and 4 are *sustained*.

(6) As to defendant's exception 5, it is *sustained*. The master erred in denying the defendant's claim for a credit as an advancement from her mother's estate, and the master's determination is *reversed*. Defendant shall be given a credit of $23,500 arising out of the 1979 advancement from her parents.

It is further hereby ordered that the matter shall be returned to the master for the purpose of preparing a proposed decree nisi in conformity with the foregoing opinion and this order; and to hold whatever further evidentiary proceedings are necessary, consistent with the foregoing opinion and order.